**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-308 (CJN)** |
| **v.** | : | |
| | : | |
| **Clive A. Kincaid,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Clive Kincaid to 2 months' incarceration, 12 months' supervised release, and an $876 fine. The government also requests that this Court impose $500 in restitution, consistent with the plea agreement in this case.

## I.      Introduction

Defendant Clive Kincaid, a seventy-six-year-old retiree, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Kincaid pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by Kincaid's (1) assault on the House Chamber Door, (2) leadership at the front of the mob at four different breach points, (3) lying during his interview with the Federal Bureau of Investigation ("FBI"), (4) statement immediately after January 6 that he would "do it again," and (5) failure to express genuine remorse for his conduct on that day.

 The Court must also consider that Kincaid's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Kincaid's crime support a sentence of 2 months' incarceration, 12 months' supervised release, and an $876 fine in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF No. 30.

### *Defendant Kincaid's Role in the January 6, 2021 Attack on the Capitol*

Kincaid drove alone from Pittsburgh to D.C. to attend the former President's rally on January 6, 2021. He listened to the former President's speech and agreed with the former President's contention that there was significant fraud in the election. During the rally, he joined the crowd walking to the Capitol. Kincaid crossed into the restricted area and ascended the

_____

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Northwest Terrace Stairs. He paid attention to politics and knew that Vice President Pence would be visiting the Capitol building that day.

While Kincaid was ascending the stairs, a police officer shot him with six rubber bullets. Instead of turning back in response to this obvious deterrent to proceeding further, Kincaid advanced up through the scaffolding toward the Capitol.

Underneath the scaffolding, Kincaid verbally engaged with officers attempting to hold the top of the stairs.  He placed his hands on a metal barrier that the officers at the top of the stairs were using as a barricade. Kincaid continued holding onto this metal barrier as other rioters pulled it away from the officers. It is unclear from the video whether Kincaid helped pull the barricade, but regardless, he continued up the stairs past that police line.



*Image 1 – Kincaid with his hand on the barrier as rioters pull it away from the officers*

After the mob pulled the metal barrier away from the officers, Kincaid stood at the top of the NW stairs and continued speaking with an officer. Kincaid claimed that he was attempting to

convince the officers to stop firing rubber bullets and to allow the mob to ascend to the Capitol building. During this conversation, Kincaid was sprayed with some type of chemical spray deployed by a rioter behind him. Eventually, the officer at the top of the stairs helped Kincaid get out of the mob and into the care of another officer who helped him clean his eyes from effects of the chemical spray.

Kincaid entered the U.S. Capitol at approximately 2:27 p.m. through the East Rotunda door less than one minute after it was violently breached.



*Image 2 – Kincaid entering less than one minute after a violent breach*

Kincaid walked to the House of Representatives' side of the building and stood at the front of the mob as it pushed through police in the statuary connector hallway. During this encounter, Kincaid again spoke to officers—the exact details of which are unknown. Kincaid later claimed that he attempted to convince the officers to bring out a Congressperson to talk with the mob. Nonetheless, the mob succeeded in breaching this line.

After the mob pushed through this police line, Kincaid again moved to the front and approached the House Chamber Doors. The mob chanted loudly, "break it down!" *See Exhibit 1.*

Kincaid watched as other rioters physically removed the officers defending the door. Since the doors were locked, Kincaid took what appears to be a police baton and used it to break the windows of the door on the left. *See Images 3* and *4* (below) and *Exhibit 1*.[2] He struck the windows eleven times and did not retreat until the officers inside the House Chamber drew their guns and pointed them through the holes in the windows. *See Image 5*, below.



*Image 3 – Kincaid at the front of the mob hitting the glass*

---

[2] This video was recovered from another defendant's phone, Michael Rusyn. *United States v. Michael Rusyn*, 21-cr-303 (ABJ) (Rusyn pled guilty on September 13, 2021). This video was not connected to Kincaid's investigation until after he pled guilty. If it had, the government would likely have pursued a felony charge against Kincaid.



*Image 4 – Screenshot from another rioter's video of the holes in the House Chamber Doors*

Image 4 comes from a video taken by Damon Beckley, one of the rioters who approached the doors just after Kincaid retreated. *United States v. Damon Beckley*, 21-cr-285 (JEB). Kincaid made the hole in the left door (circled in yellow) by striking the window there eleven times with a baton. The Architect of the Capitol assessed this hole to represent $876 of damage.



*Image 5 – Screenshot showing a USCP officer with gun drawn and a Congressman*

Image 5 also comes from Damon Beckley's video and shows the view through one of the holes in the right House Chamber Door, shortly after Kincaid retreated. There were at least three United States Capitol Police ("USCP") officers pointing their guns at the rioters through the holes in the doors and many Congressional representatives sheltering inside the chamber.

After failing to breach the House Chamber, Kincaid walked up to the third floor before exiting the Capitol building through a door on the South side of the first floor at 2:52 p.m., twenty-five minutes after entering.

In August 2023, Kincaid interviewed with a local news outlet—*The Durango Herald*. In this interview, he defended his actions and stated, "Of course I'd do it again because I did it out of honesty." *See Exhibits 2* and *3*.

*Kincaid's Pre-arrest Interview with the FBI*

On August 28, 2021, Kincaid gave a pre-arrest interview to the FBI. *See Exhibit 4*. He admitted to going inside the U.S. Capitol building on January 6 and identified himself in pictures there. Kincaid also admitted to being shot six times with rubber bullets and being hit with pepper spray outside the Capitol. Video evidence supports those admissions.

Then, Kincaid lied to the agents by suggesting that he did not participate in any violence or destruction of property inside the U.S. Capitol. Instead, he claimed that he told other rioters to stop their violence and destruction. *Exhibit 4* at 26:28-42. While there is evidence of Kincaid attempting to stop one instance of property damage, Kincaid himself became violent and destructive when he attempted to break into the House Chamber by smashing the windows with a baton. *See Exhibit 1* and *Image 3*. Kincaid described his entire trip through the Capitol in great detail, while strategically omitting his attempt to physically breach the House Chamber.

When asked if he saw anything upstairs, the floor with the House Chamber, Kincaid again lied to the agents. He claimed, "I just wanted to see the building because I studied architecture. I never was near that other thing that happened with that girl.[3] Did I go into any rooms? No. I just wanted to see the building." *Exhibit 4* at 20:53-21:18. His contention that he just "wanted to see the building because [he] studied architecture" is directly contradicted by his assault on the House Chamber Door—a determined attempt to violently lead the mob onto the floor of Congress.

*The Charges and Plea Agreement*

On September 7, 2023, the United States charged Kincaid by a four-count Information with violating 18 U.S.C. § 1752(a)(1 and 2) and 40 U.S.C. § 5104(e)(2)(D and G). On April 9, 2024, pursuant to a plea agreement, Kincaid pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Kincaid agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Kincaid now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Kincaid faces up to one year of imprisonment and a fine of up to $100,000. Kincaid must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

---

[3] Kincaid was likely referencing Ashli Babbitt's confrontation with USCP in the hallways at the other side of the House Chamber.

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government respectfully disagrees with the Sentencing Guidelines calculation set forth in the PSR pertaining to Obstruction of Justice under U.S.S.G. § 3C1.1. *See* PSR at ¶ 39. While Kincaid's lie was obstructive and should certainly play a role at sentencing, the government cannot affirm that the false statement impeded this particular investigation in such a significant way. *See* U.S.S.G. § 3C1.1, note 5(B). Rather, the discovery of additional video documenting the House Chamber door attack was unfortunately not identified in time for the plea in this case. Thus, the Sentencing Guidelines calculation should be:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. § 2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 34-44.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

The PSR correctly determined that Section 4C1.1 does not apply because Kincaid used violence against property when he hit the House Chamber Door windows with a baton eleven times with sufficient force to break those windows. *See* PSR at ¶ 43; *Exhibit 1.*[4]

---

[4] Other courts in the District have defined the "use of violence" as "[t]he use of physical force, typically 'accompanied by fury, vehemence, or outrage,' and 'unlawfully exercised with the intent

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, even if the Court were to apply the § 4C1.1 reduction, it should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[5]

The U.S. Probation Office calculated Kincaid's criminal history as a Category I. PSR at ¶ 47. Accordingly, the U.S. Probation Office calculated Kincaid's total adjusted offense level, after acceptance, at 6, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 84. The agreed-upon Guidelines' calculation in Kincaid's plea agreement differs from the PSR because the government had not yet discovered his attempt to breach the House Chamber Door. The PSR correctly determined that Kincaid's lie to the FBI regarding this violent and destructive act constituted Obstruction of Justice under U.S.S.G. § 3C1.1.

---

to harm'" or as the "exertion of any physical force so as to injure or abuse." *See United States v. Bauer*, 21-cr-386-2 (TNM), Mem. Op., ECF No. 195, at 4-5 (internal citations omitted). Since Section 4C1.1(b) does not define violence, the term should be given its ordinary meaning. The ordinary meaning of violence includes the use of force against property as well as against persons. *See Violence*, MERRIAM-WEBSTER.COM (July 29, 2024) ("the use of physical force so as to injure, abuse, damage, or destroy").

[5] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 2 months' incarceration, 12 months' supervised release, and an $876 fine.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Kincaid's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Two critical factors in Kincaid's case are his presence at the front of the mob at four critical breach points and his attempted breach of the House Chamber by breaking the windows with a baton.

11

Kincaid moved to the front of the mob under the NW scaffold stairs, at the East Rotunda Doors, in the statuary connector hallway, and at the House Chamber Doors. Instead of retreating when he was hit with six rubber bullets and sprayed with pepper spray, Kincaid pressed forward to the Capitol building. On the NW scaffold stairs and in the statuary connector hallway, Kincaid occupied the attention of officers who attempted to hold the line. Even if the Court credits his claims that he was attempting to convince them to allow the rioters to pass, Kincaid served as a leader of the mob. By always pushing to the front and engaging officers, he distracted the officers while encouraging the mob forward. At no point did Kincaid turn to attempt to convince the mob to retreat, disperse, or stay outside. He wanted to help the mob gain access to the House Chamber, and when he was finally met with locked doors he resorted to violence.

Kincaid's assault on the House Chamber Door was aggressive, determined, and was only thwarted by the aimed guns of the United States Capitol Police. This conduct – if discovered in time – could have potentially resulted in additional criminal exposure, including 18 U.S.C § 231 and misdemeanor 18 U.S.C. § 1361. But this was not the typical, random destruction that often occurred on January 6, 2021. Kincaid's smashing of the window was targeted specifically at the center of the door to the House of Congress. He made a hole at roughly waist height in the door on the left—perfectly placed to allow a rioter to reach through and unlock the door. Again, Kincaid took on a more outsized role—pushing to the front and using violence to attempt to open the floodgates onto the House floor. In the context of a misdemeanor sentencing based on the above, the defendant's conduct is particularly aggravating.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Kincaid's History and Characteristics

Kincaid is seventy-six years old and has had some health problems. While these are legitimate mitigating factors for the Court to consider, the Bureau of Prisons consistently addresses health issues for prisoners in its custody, as it should. Notwithstanding his age and his health, his record is otherwise unremarkable.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to Kincaid also weighs heavily in favor of a term of incarceration.

In his interviews with the FBI and *The Durango Herald*, Kincaid never expressed any regret or remorse for any of his conduct on January 6, 2021. Instead, Kincaid told *The Durango Herald*, "Of course I'd do it again because I did it out of honesty." When talking to the FBI, Kincaid only laments the actions of the Capitol Police and never the determination of the mob. In both interviews, he implied that he never committed any violence or property destruction—when he did, at the House Chamber Door. It is critical that the Court's sentence deter Kincaid from ever committing political violence again and convince him that his actions on January 6 were unacceptable.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[6] This Court must sentence Kincaid based on his own

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Kincaid has pleaded guilty to Count One of the Information, charging him with Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Derek Andrew Nelson*, 24-cr-74-CJN, is a good starting comparator. In *Nelson*, the defendant also pled guilty to 18 U.S.C. § 1752(a)(1), and the Court sentenced him to 75 days' incarceration followed by 12 months' supervised release. Both Kincaid and Nelson were present at the front of the mob at the critical breach point on the NW scaffold stairs and at the attempted breach of the House Chamber Door and both made statements minimizing their conduct and lacking true remorse. The *Nelson* case was aggravated by his preparation for violence and his physical confrontation with an officer, but Kincaid also used physical violence when he bashed the House Chamber Door eleven times with a baton—breaking the window in an attempt to breach

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the chamber. Kincaid's violent conduct and lack of remorse merit comparison to *Nelson*, but his advanced age and health concerns justify our slightly lower recommendation of 2 months' incarceration.

In *United States v. Kurt Peterson*, 21-cr-427-CJN, the Court sentenced a defendant who broke a window, failed to show remorse, and lied about his violent conduct. *See* Government's Sentencing Memo, ECF No. 63, p. 3-10. Peterson pled guilty to a more serious charge—engaging in physical violence with a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A)—and the Court sentenced him to 45 days' incarceration and 2 months' home detention. In significant ways, Kincaid's conduct is more aggravated than Peterson's. Kincaid ascended the stairs to the Capitol building undeterred by six rubber bullets. He led the mob at multiple breach points and broke a window on the House Chamber door in an attempt to breach the chamber. This door was the last barrier separating the mob from members of Congress. Finally, Kincaid's interviews with the FBI and *the Durango Herald* capture his efforts to lie about his violent conduct and general lack of remorse for helping the riot forward. Given these aggravators, Kincaid requires a more serious sentence than Peterson. While the ultimate count of conviction is different, the conduct is nonetheless helpful to contextualize that – despite a misdemeanor count – Kincaid's behavior created serious danger and escalated violence and destruction in multiple ways at multiple points. As this Court has recognized, every person's knowing and voluntary involvement in a mob helped create the conditions for the riot to succeed in the way that it did.

Ultimately, there are no exact comparators for Kincaid's case because it is rare for the government to discover additional evidence of possible felony and misdemeanor conduct following a plea. The defendant's benefit of the bargain was thus incredibly auspicious, despite the overall conduct.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Kincaid must pay $500 in restitution, which reflects in part the role Kincaid played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Kincaid's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 103.

## VII.  Fine

The defendant's conviction for violation of 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of not more than $100,000[9]. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[9] Kincaid's plea agreement contemplated a possible fine. See Plea Agreement ¶ 5C ("[T]he parties agree that, pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level 4, the estimated applicable fine range is $500 to $9,500."

sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay[10], thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $500 to $9,500. U.S.S.G. § 5E1.2(c).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

---

[10] Probation was "unable to determine if the defendant has the ability to pay a fine." PSR ¶ 82.

U.S.S.G. § 5E1.2(d). *See* 18 U.S.C. § 3572(a).

According to the Architect of the Capitol, Kincaid caused $876 of damage to the House Chamber door when he broke the window. Normally, the parties would have agreed to a restitution amount that included this damage, but the government did not discover the damage in time for his plea. An $876 fine is thus necessary "to reflect the seriousness of the offense (including the harm or loss to the victim …), to promote respect for the law, to provide just punishment and to afford adequate deterrence." U.S.S.G. § 5E1.2(d)(1).

### VIII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Kincaid to 2 months' incarceration, 12 months' supervised release, and an $876 fine. The government also requests that this Court impose $500 in restitution, consistent with the plea agreement in this case.

Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Kincaid's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Tighe Robertson Beach*
Tighe Robertson Beach
Assistant United States Attorney
CO Bar No. 55328
555 Fourth Street, N.W., Room 6.717
Washington, DC  20530
(240) 278-4348
tighe.beach@usdoj.gov

20