# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:23-cr-00308-CJN** |
| **CLIVE A. KINCAID,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Clive Kincaid ("Mr. Kincaid"), by and through his attorney, Ryan Brungard of DUTHIE SAVASTANO BRUNGARD, PLLC, respectfully moves the Court to impose a sentence that uses an alternative to incarceration and in support thereof submits this Sentencing Memorandum for this Honorable Court's consideration prior to the August 15, 2024 scheduled sentencing.

## INTRODUCTION

The Sentencing Guidelines range for this offense is not in dispute: the government, Mr. Kincaid and Probation all agree that the applicable Sentencing Guideline Range is 0-6 months, which is partially based on the unanimous agreement that Mr. Kincaid has a criminal history category score of zero (0), making him a criminal history category of I (one). With respect to the total offense level calculation for Mr. Kincaid, the government and Mr. Kincaid agree at an initial level that the calculation outlined in the parties' Plea Agreement, [ECF # 30], which resulted in a total adjusted offense level of four, is appropriate. *See Government's Sentencing Memorandum*, [ECF # 33], at 9. However, Mr. Kincaid has proposed that the zero point offender adjustment (reduction) permitted by U.S.S.G. § 4C1.1 applies to reduce his total offense level calculation, which, if the Court were to agree, would put his total offense level at 2.[1] The government and Probation do not

---

[1] Mr. Kincaid previously objected to Probation's assertion that the zero point offender adjustment

1

agree that such reduction applies in this because they argue Mr. Kincaid used violence against property. *See id.* at 9-10. Finally, Probation asserts that Mr. Kincaid's total offense level should include an enhancement for obstruction of justice. *See Presentence Investigation Report ("PSR"),* [ECF # 34], at para. 39. On this, both the government and Mr. Kincaid disagree. *See Government's Sentencing Memorandum* [ECF # 33] at 9; *Defendant's Objections/Clarifications to Presentence Report* [ECF # 32].

In sum, the government asserts Mr. Kincaid's total offense level is 4. Probation asserts Mr. Kincaid's total offense level is 6. Mr. Kincaid asserts is total offense level is *no more than* 4 and with the zero point reduction would be 2. Despite the different offense level calculations, all agree the Sentencing Guideline range of imprisonment remains the same – that is, 0 to 6 months incarceration.

As it relates to the 0 to 6 month advisory range of imprisonment in this case, the government asks the Court to impose 2 months of incarceration. *See Government's Sentencing Memorandum* [ECF # 33] at 20. Probation recommends no imprisonment or home detention, but rather, three years of supervised probation. *PSR Sentencing Recommendation,* [ECF # 35], at 1.

This memorandum mainly explains why an alternative to incarceration sentence is appropriate in this case. Mr. Kincaid asks that he be sentenced to probation in this case, per Probation's recommendation, based on a complete review and application of all 18 U.S.C. § 3553(a) factors.

---

(reduction) permitted by U.S.S.G. § 4C1.1 does not apply to Mr. Kincaid. Upon further research and review, including of other cases, Mr. Kincaid acknowledges the difficulty in making this argument. While Mr. Kincaid did not assault any law enforcement (or any third parties) or threaten to do so, did not scream profanities, did not punch/kick/grab or throw objects at law enforcement, he does acknowledge that he took a baton to Capitol property, apparently causing some damage, and that such could fall under the sweeping definition of what is considered "violence or credible threats of violence" making in ineligible for the reduction.

The Court is tasked with imposing a sentence that is "sufficient but not greater than necessary" considering seven factors listed 18 U.S.C. § 3553(a), namely:

1.) The nature of the offense and the history and characteristics of the defendant;

2.) The purposes of sentencing (Rehabilitation, Deterrence, and Retribution);

3.) The kinds of sentences available (i.e., alternatives to prison);

4-5.) The Sentencing Guidelines and their Policy Statements, which are advisory;

6.) Avoiding disparity in treatment of similar offenders; and

7.) The need to provide restitution.

The Supreme Court held that although the district courts should start with the Sentencing Guidelines, the courts should also consider all of the 18 U.S.C. § 3553(a) factors to determine a reasonable sentence. *See Pepper v. U.S.*, 562 U.S. 476 (2011) (internal citation omitted).

## ANALYSIS

Mr. Kincaid will appear in person in front of this United States District Court in Washington D.C. for his first federal case and to be sentenced for his first criminal conviction of any kind. Mr. Kincaid comes from a small mountain town in rural Pagosa Springs, Colorado where he lives with his wife in a cabin like home nestled up in the mountains that receives sometimes upwards of 30 feet of snow per year. Life at home for Mr. Kincaid is presumably quite different than the day-to-day living of those in a busy city like Washington D.C. Now retired after having worked throughout his life, including for the federal government (i.e., BLM) for many years, Mr. Kincaid may be one of the oldest defendants charged for his conduct on January 6, 2021. This is not to age Mr. Kincaid at all. But he has Seventy-Six years of living life without any criminal conduct until January 6, 2021. On that day, Mr. Kincaid eventually found himself surrounded by others who he joined in approaching and entering the U.S. Capitol. Although he went alone that day to the Capitol, having not made any plans other than to listen to a speech, Mr. Kincaid found himself at the wrong place at the wrong

3

time. Although there is no suggestion otherwise, Mr. Kincaid had and has zero ties to any organized groups or third parties that planned to storm the Capitol or commit any sort of crimes whatsoever. Mr. Kincaid happened to be in the Pittsburgh area where his family maintained an apartment which was close to a hospital where his son had been receiving mental health treatment for severe schizophrenia. Although there was nothing wrong with going to see and listen to a speech, Mr. Kincaid joined the growing crowd who approached the U.S. Capitol. He got caught up in the circumstances and engaged in unacceptable conduct. He will appear in this Court having admitted to the conduct he pled guilty to as well as additional conduct in taking a baton to a House Chamber door, conduct that was not part of the initial statement of offense at the time of entry of plea and conduct that cannot be condoned by any stretch of the imagination. The Sentencing Guidelines call for a sentence of zero to six months and despite any differences the parties and Probation may have regarding the accurate total offense level, Mr. Kincaid will find himself in Zone A of the U.S.S.G. Sentencing Table, something that counsel simply rarely if not ever sees in his federal criminal practice. Frankly, it is a breath of fresh air, in that a sentence of imprisonment is not required here. Indeed, imprisonment does not serve a genuine purpose in any respect in this case and presumably, Probation, who is in the business of assisting and making recommendations to this Court as to the appropriate of imprisonment versus community supervision, agrees that it is not necessary as it relates to Mr. Kincaid despite his regressions involved in this case.

Rather, the Court should examine Mr. Kincaid's life (he is now 76 with health issues – having been hospitalized for a heart attack before this case was charged but during pre-plea discussions with the government) as a father (whose son has tragically passed away while this case/investigation have been pending for years) that cares deeply about his familial relationships, is a hard worker with no criminal history (zero points) who before this case never set foot in a jail (let alone prison) a day in his life, and is a law abiding citizen with a solid heart and nothing but genuine

intentions that found himself caught up with the wrong people at the wrong time. As anticipated, Mr. Kincaid has had no issues whatsoever with pretrial supervision compliance and there is <u>nothing</u> to suggest this would change post sentencing.

Despite painting a less than glowing picture of Mr. Kincaid, the government argues that Mr. Kincaid should serve 2 months of imprisonment, then 12 months' supervised release, and also pay an $876 fine along with $500 in restitution. Mr. Kincaid takes no issue with the fine or restitution amount requested by the government. In support of its request for 2 months imprisonment, the government cites (1) Mr. Kincaid's assault on the House Chamber Door, (2) His leadership role at four different breach points, (3) His deception during the FBI interview, (4) His statement of willingness to repeat his actions and finally, (5) His lack of genuine remorse. *See Government's Sentencing Memorandum* [ECF # 33] at 2. Mr. Kincaid will respond to the foregoing below and at sentencing.

<u>Factor 1:</u> **Nature of the Offense and History and Characteristics of the Defendant**

*(a) Nature of Offense*

The Court is already familiar with the general background surrounding the events on January 6, 2021. In addition, although described in various prior filings in this case, including in the PSR and the *Government's Sentencing Memorandum* and the *Statement of Offense*, Mr. Kincaid recounts his particular involvement in this case here. Notably, although counsel and Mr. Kincaid agree that the Statement of Offense [ECF # 30] submitted in support of the Plea Agreement in this case does not include Mr. Kincaid's conduct relating to taking a baton to the House Chamber door (described further below), all of the conduct under *Clive Kincaid's Participation in the January 6, 2021 Capitol Riot* remains fully accurate and the government has not suggested otherwise. *See id.*

On January 6, 2021, Mr. Kincaid was one of the many people who went to Washington, D.C. to listen to a speech. He drove alone from Pittsburgh. After the former President's speech, he

joined the crowd walking to the Capitol and eventually crossed into restricted areas at the Capitol. Mr. Kincaid was hit with six rubber bullets yet continued advancing toward the Capitol. Despite suggestions otherwise, Mr. Kincaid does not believe he was targeted by police but rather on the receiving end of rubber bullets being fired into a general area. Either way, he was shot by bullets and Mr. Kincaid agrees in retrospect that the time to turn back and go home was at this point, at the latest.

Mr. Kincaid made his way to the top of the Northwest Terrace Stairs, held onto a metal barrier, and proceeded up the stairs after it was pulled away by other rioters. Mr. Kincaid arrived at the top of the stairs and began talking with officers when he was pepper sprayed, apparently from a rioter behind him who had deployed spray. Fortunately, Mr. Kincaid was pulled out of the mob by a law enforcement officer who got him out of the shuffle and into the care of another young law enforcement officer who cared for Mr. Kincaid and helped him wash his eyes for approximately twenty minutes right outside the Capitol. Mr. Kincaid gets filled with emotional and gratefulness when he remembers the kindness of this officer who assisted him. Admittedly, this was another opportunity for Mr. Kincaid to turn around and head back to his apartment. Nonetheless, Mr. Kincaid proceeds to join others entering the Capitol and did so at approximately 2:27 p.m., shortly after other rioters had breached the East Rotunda door.

While in the Rotunda, Mr. Kincaid told other rioters to stop knocking over the velvet rope stanchions and to stop damaging things. Mr. Kincaid next found himself in the front of a group of people who were pushing through police in the statuary connector hallway. At this time, Mr. Kincaid again spoke to officers and tried to calm down other rioters, at one point putting his hands up, trying to stop other rioters from pushing forward.

At some time briefly thereafter, Mr. Kincaid was in the front of a group of people near the House Chamber Door. Another rioter was swinging what appears to be a baton with an over the

6

shoulder motion and clearly hitting the glass of the door and breaking it. In a time period measured by seconds, Mr. Kincaid takes possession of this other rioter's baton and strikes the House Chamber Door. Mr. Kincaid left this area, went upstairs to higher floors in the Capitol briefly before eventually exiting the Capitol.

Mr. Kincaid was inside the Capitol for 25 minutes. Mr. Kincaid was at the Capitol by himself, did not know the other rioters and was not affiliated with any gangs or groups of any kind, whether extremist or otherwise, and certainly came with no weapons like a baton. After January 6, 2021, and specifically on August 28, 2021, Mr. Kincaid was stopped by law enforcement (the "FBI") at the Denver International Airport, while he was returning from Costa Rica. Mr. Kincaid was approached by the FBI and interviewed. The FBI did not believe this was a custodial interview and Mr. Kincaid was not under arrest. This interview was recorded and has been made part of discovery in this case, and is cited multiple times by the government in its sentencing memorandum. *See Government's Sentencing Memorandum*, [ECF # 33], Exhibit 4. Mr. Kincaid was without counsel and spoke with the FBI about January 6, 2021 for approximately one hour. During the interview, Mr. Kincaid of course agreed he was inside the Capitol and answered questions the FBI presented him with, including confirming his identity and personal information, including his identity in certain pictures of him shown by the FBI, confirming much of the information included in the Statement of Offense made part of the Plea Agreement in this case, and discussing his involvement inside and outside of the Capitol, and his experience and personal background. Mr. Kincaid was cooperative and emotional at times and the FBI was empathetic towards him at times. The government claims Mr. Kincaid admitted his involvement and injuries but falsely claimed to have avoided violence and property destruction. To be clear however, review of the recorded audio of the August 28, 2021 interview itself demonstrates that the FBI only inquired whether Mr. Kincaid assaulted any law enforcement or engaged in violence. *Id.* Mr. Kincaid responded by saying no, no, no. In fact, Mr.

Kincaid never physically assaulted anyone let alone law enforcement. Upon listening to the audio, the FBI *never* directly asked Mr. Kincaid if he damaged any property, as suggested by Probation or the government. This is supported by the fact that it is clear the FBI had no information that Mr. Kincaid had allegedly damaged property at the time of the interview. In retrospect, Mr. Kincaid can understand how property damage might be considered "violence" but that is not how he understood the FBI inquiry in the context of the dialogue he was having with them.

After the FBI interview, Mr. Kincaid continued to cooperate despite not yet being charged. He would proactively stay in touch with the FBI (still without legal counsel) about how he could be contacted and where including in the Winter months when he and his wife spent time away from home due to snow. This occurred multiple times despite no responses or inquiries from the FBI. Mr. Kincaid eventually provided the FBI with the clothes that he still had that he wore on January 6, 2021. Undersigned counsel eventually became involved and would stay in touch with the government through the various prosecutors that changed over the years. *Years later*, once finally charged in September of 2023, Mr. Kincaid self-surrendered to the U.S. Marshal's office in the District of Colorado and has appeared at all proceedings since then. Mr. Kincaid has been fully compliant while on pretrial supervision. Counsel is confident there is no dispute that there was a lot of cooperation by Mr. Kincaid with the government before and during the pendency of this case. Had there not been, presumably Mr. Kincaid would not be receiving a reduction of points for acceptance of responsibility and presumably the government's position would be that he attempted or did obstruct justice and that he should be further punished accordingly.

It was not until after the plea agreement [ECF # 29] and change of plea process that the government disclosed it had come into information from another case by way of video that showed Mr. Kincaid briefly hitting a House Chamber door with some sort of baton that he took from the hands of another rioter standing nearby. While it cannot be confirmed with 100% certainty the

specific damage, if any, caused by Mr. Kincaid taking a baton to the door, he admits to engaging in this conduct.

The government has urged the Court to consider the seriousness of the offense and the need to promote respect for the law, highlighting the January 6 attack as an assault on democracy. Mr. Kincaid, however, should be sentenced based on his nonpolitical involvement in the offense, not the intentions, actions or conspiracies of other individuals or groups or the crimes of thousands of other people. There is no doubt that despite being hit with rubber bullets and pepper-sprayed, Mr. Kincaid should have turned around and gone home rather than pushed forward to the Capitol. However, whether the Court, government or Probation finds this credible or not, Mr. Kincaid's conduct was always motivated by the desire to try to calm the situation down and the hope to engage with someone that could address the crowd to deescalate the situation.

The government points to certain articles written by *The Durango Herald* where Mr. Kincaid discussed his involvement and thoughts related to what happened on January 6. In one of the articles, Mr. Kincaid is quoting as saying "Of course I'd do it again because I did it out of honesty."[2] Taken out of context, this could be read to mean that Mr. Kincaid would take a baton to a House Chamber Door again. Clearly this is not what Mr. Kincaid meant. In the article, he also states he regrets what happened, that the Capitol was amazing and lit his heart up, and portrayed himself as a curious person who was observing the day's events. In the article, Mr. Kincaid also states "[h]e wishes he would have gotten to the Capitol sooner to try to 'stop something bad from happening'" and that he "'was attempting to stop this whole mess from happening.'"[3] In the other article cited by the government, Mr. Kincaid further discusses his attempts to

---

[2] *Pagosa Springs man arrested in connection with U.S. Capitol riots*, The Durango Herald, August 25, 2023, https://www.durangoherald.com/articles/pagosa-springs-man-arrested-in-connection-with-u-s-capitol-riots/ (last accessed by counsel on August 13, 2024).
[3] *Id.*

deescalate the circumstances on January 6 including telling others to stop damaging Capitol property and how he had hoped a representative from Congress would have come out to speak with the people in an attempt to calm things down.[4] In reflecting on his desire to be the knight in shining armor, Mr. Kincaid is quoted saying "'I should not have been, perhaps, so naive to think I could enter the rotunda and convince somebody to send someone out to talk to the people.'"[5] Although Mr. Kincaid felt that is what should have happened to calm the crowd, and that is what he was trying to effectuate, the concept years later sounds beyond naïve and Mr. Kincaid recognizes this. One thing is clear, unlike many others present, Mr. Kincaid was not attempting to stop the certification of then-President-elect Biden's electoral win. Again, his curiosity simply put him in the wrong place at the wrong time.

Although his thinking and conduct about how he could assist on January 6 was at the least naïve, the government's suggestions that Mr. Kincaid caused further harm by distracting officers when he talked to them or that he was "encouraging" other rioters because he happened to be in front of certain groups of people, were simply not in Mr. Kincaid's mind. By engaging, he was not attempting to distract. By being in a group of people, and sometimes in front, that doesn't mean he was a leader or encouraging others. Outside of the 10 seconds or so where Mr. Kincaid regrettably took a baton to the House Chamber Door, his actions demonstrated that he violated the statute he pled guilty too but also that he was trying to calm other rioters and talk to officers about trying to get someone (from Congress, a staffer or otherwise) out to speak to the rioters in an attempt calm said rioters. While Mr. Kincaid's actions at the House Chamber Door were unequivocally unacceptable, it is disingenuous for the government to now catastrophize Mr. Kincaid's other

---

[4] *Clive Kincaid recounts events leading up to, during Jan. 6 Capitol riots*, The Durango Herald, August 25, 2023, https://www.durangoherald.com/articles/clive-kincaid-recounts-events-leading-up-to-during-jan-6-capitol-riots/ (last accessed by counsel on August 13, 2024).
[5] *Id.*

admitted conduct as being targeted, deliberate, aggravated and violent. But for Mr. Kincaid's brief disturbing conduct at the House Chamber Door, suggesting that he was otherwise generally aiming to unlock other doors to allow access to other rooms in the Capitol or that he was a leader "within the mob" who used violence is simply not supported the actual evidence of the great majority of Mr. Kincaid's actual actions during the time he was at the Capitol. The reality is that Mr. Kincaid's total offense level calculation would be much higher if everything in the grim movie reel directed by the government were true. Mr. Kincaid will address the Court about his failure at the House Chamber door and complete lapse of momentary judgment at that time but painting all of Mr. Kincaid's conduct as aggravated is simply not fair.

Mr. Kincaid was not an organizer, manager, leader, supervisor or anything of the like having to do with crime or organized crime that occurred on January 6, 2021. Despite the foregoing, Mr. Kincaid and counsel cannot emphasize enough how much Mr. Kincaid understands the seriousness of what he was charged with and accepted responsibility for (and for conduct he was not charged with which he has also accepted responsibility for). Mr. Kincaid has been in his own mental prison since he realized he was being investigated in August of 2021. At sentencing, there will have been almost three years that have gone by since Mr. Kincaid found out his conduct was being investigated. Mr. Kincaid does not challenge his conviction, the seriousness of the charges, or his conduct on January 6, 2021. But we do seek to place him in perspective for sentencing. On this, in recommending a non-prison sentence, it is important to highlight him as a person.

### (b) History and characteristics of the defendant

After *Booker*, there is "no limitation … on the information concerning the background, character, and conduct of the defendant which a court may receive and consider for the purposes of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court can and should consider Kincaid's history and character outside this offense. Mr. Kincaid appears for sentencing in this

11

Court facing his first criminal conviction. As stated above, he has a criminal history score of zero. In other words, the Court and Mr. Kincaid, prior to this case, have no history. Mr. Kincaid has not submitted a laundry list of character letters. To be direct, while his character will certainly be questioned for some of his actions and decisions on January 6, 2021, the reality is that nobody is saying that this 76 year old man is a bad person or has serious character flaws. This Court will be able to assess Mr. Kincaid in person. Still, some background is necessary.

Probation does a good job of describing Mr. Kincaid's background. While Mr. Kincaid could and would love to talk for hours about much of his 76 years, such is not necessary. Mr. Kincaid was born in California. He experienced a rough childhood and grew up in a politically charged household, having parents whose strong ideological beliefs inoculated him from extremism. Mr. Kincaid excelled in high school in California and eventually married his wife in 1973, who is a retired archaeologist, having worked for the Bureau of Land Management for many years, like Mr. Kincaid. Worthy of noting, Mrs. Kincaid has been a massive support for Mr. Kincaid throughout the last few years. After spending a few months attending college at USC, Mr. Kincaid graduated magna cum laude from UCLA in 1975 with a degree in Anthropology. Mr. Kincaid and his wife had one son, Nicholas, who suffered from severe schizophrenia and Mr. Kincaid and his wife devoted their lives to making sure that their son received the best care and treatment possible. Tragically, Nicholas passed away while this case was pending – in January of 2024. Although Mr. Kincaid is still struggling with the passing of his son this year, he has no notable mental health and substance abuse issues of any kind and never has.

The Kincaid family has and still does live in the same rural southwest Colorado home as they have for the last thirty years – in Pagosa Springs. Mr. Kincaid finds himself quite busy throughout the year managing the many acres of the property. The property is secluded, peaceful and surrounded by beautiful wilderness.

Although he has been retired since 2017, Mr. Kincaid previously owned and operated a retailer of native artifacts for many decades and worked with indigenous people of Mexico, Guatemala, Costa Rica, Panama, and Columbia in doing so. Mr. Kincaid served as the executive director of the non-profit Native Future between 2003 and 2006, which focused on the protection of native tribal areas in the jungles of Panama. In the 1980's Mr. Kincaid founded and ran the Southern Utah Wilderness Alliance, a non-profit agency that managed protected areas in Utah, where he served as the executive director for eight and a half years. Prior to that, between 1975 and 1981, he worked for the Bureau of Land Management in Phoenix, Arizona. Mr. Kincaid is incredibly proud of his environmental work which included locating parcels of land that were potential legitimate regions viable for protection. Maybe unlike any of the other January 6 defendants, Mr. Kincaid had been to the Capitol before, including when he testified before the United States Congress in 1985 about prior BLM operations which he investigated and documented in the years prior. In light of his work, testimony, and presentation, about 2,800,000 acres of land were subsequently added to the wilderness review and completely protected. Mr. Kincaid engaged in detailed fieldwork and environmental advocacy efforts highlighting systemic issues within Utah's wilderness protection policies. Mr. Kincaid also worked for the National Wilderness Society and the National Sierra Club.

With respect to his physical health, Mr. Kincaid told Probation that he has had approximately 21 surgeries in his life. This includes an open heart surgery, cervical spine surgery, and two knee surgeries for which he now has titanium in both knees. Mr. Kincaid and his wife's physical health have deteriorated since January 6, 2021. Mr. Kincaid had a heart attack while this case was pending for which he was hospitalized for and raised a memory loss concern for a period of time. Mr. Kincaid more recently has been experiencing severe pain in his left

13

knee and finally was able to get in with a specialist in Denver, CO on August 13, 2024 to discuss future and potential more immediate additional left knee surgery. It has been confirmed that this surgery will need to occur. This prognosis will be better understood at the time of sentencing. Mr. Kincaid's wife recently underwent hip surgery and is due for her second one soon. Both Mr. Kincaid and his wife rely on each other to assist the other with simple everyday tasks which are even more difficult on a rural property that requires ongoing maintenance. Mr. Kincaid is devastated about the possibility of not being able to care for his wife (and properly care for himself) if he were to be sentenced to imprisonment for any period of time.

Over the past handful of years, counsel has learned of many of Mr. Kincaid's life experiences and has listened to Mr. Kincaid emphasize his love for this country by sharing his significant historical family connections and pride in his heritage. While his actions on January 6 would appear to contradict this proposition, Mr. Kincaid has always maintained that he was motivated to try to do something good and helpful and deescalate a devastating situation that was occurring in front of him on January 6.

In short, an examination of the nature and circumstances of the offense and the history and characteristics of Mr. Kincaid demonstrate that his actions on January 6 were an aberration and a significant yet very short time in his life where he used very poor judgment, rather than the product of a career criminal. Mr. Kincaid understands that the decisions that got him here are serious. He has had significant time to learn from the decisions he has made and understand the extent of what he has done. It is clear to Mr. Kincaid that he will never put himself in a situation like January 6 again and he will continue to respect the law even more so now.

14

### Factor 2: The Purposes of Sentencing
### (Rehabilitation and Deterrence)

#### (a) Rehabilitation

In light of the nature of the offense, Mr. Kincaid understands that his future could involve incarceration. This devastates him on a daily basis. However, when considering Mr. Kincaid's personal characteristics, including his lack of criminal history and flawless pretrial supervision compliance, in conjunction with the section 3553(a) factors, the Court is charged with "recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582. Even more, counsel submits respectfully that this is all the more applicable when speaking about a first time offender with no similar background and who is not a career criminal. Respectfully, neither Probation nor the government have suggested Mr. Kincaid needs to be rehabilitated. That is because he doesn't.

#### (b) Deterrence

The government has stated that the need for general deterrence in this case is significant, emphasizing that future rioters must be deterred to protect democratic processes. In addition, the government argues specific deterrence is also critical, as Mr. Kincaid has shown no remorse for his actions. The government's position is essentially that Mr. Kincaid's lack of regret and repeated justification of his actions to the FBI and the press underline the need for a stringent sentence to prevent future offenses.

The government's arguments here are misinformed. As discussed above, Mr. Kincaid regrets his actions on January 6 especially his actions at the House Chamber Door. The Court will be in a position to evaluate Mr. Kincaid's remorse at sentencing. Mr. Kincaid never struggled to accept responsibility for his actions and although the government learned of Mr. Kincaid's conduct at the House Chamber Door after the change of plea process in this case, that does not mean he does not absolutely regret it. He does. Mr. Kincaid even stated he regretted his actions in the newspaper

articles, and while he shouldn't have joined the crowd approaching and entering the Capitol, he does not regret that he engaged in efforts to calm the crowd and stop others from rioting and damaging things. Further, as stated throughout this memorandum, suggesting that Mr. Kincaid lied or repeatedly lied to the FBI is just not true. The audio interview speaks for itself.

A sentence of incarceration is not needed to protect society from Mr. Kincaid re-offending. This simply cannot be disputed. Whether Mr. Kincaid officially receives the zero point offender reduction or not, Mr. Kincaid's criminal history score is zero under the Sentencing Guidelines for a reason: he is a law-abiding citizen. As applied to this specific defendant and in general, the Court and the government have already sent a clear message to Mr. Kincaid (counsel can assure the Court of this) and the public through many avenues. This includes the charges he has faced after years of investigation (which have been reported about in articles and noted on the DOJ website), being under the FBI and government's radar, the guilty plea he entered, the pretrial requirements and limitations, and the court process this 76 year old man has been subject to while he is constantly wondering what his fate will be. This is and has been a real deterrent effect on Mr. Kincaid and the public but is not "greater than necessary" to achieve the purposes of sentencing.

Non-violent first time offenders, like Mr. Kincaid, pose the lowest risk of recidivism. While it could be asserted that in light of his conduct in taking a baton to the House Chamber Door that Mr. Kincaid is a violent person, the reality is that he is not and his life history clearly reflects this. He is so far from a violent person. First time offenders have lower rates of rearrest, reconviction, and reincarceration than other federal defendants. This is particularly pronounced when defendants have zero versus one criminal history point. The amended commentary to USSG §5C1.1 goes even further when addressing non-violent first-time offenders who receive an adjustment under §4C1.1, "a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate. *See* 28 U.S.C. § 994(j)."

As it relates to deterrence specific to Mr. Kincaid, he understands and agrees that public protection from future crimes committed by him is an important sentencing factor. Why should this Court believe that Mr. Kincaid is not a threat or risk in the future? Because in his 76 years he has not presented himself as such. Mr. Kincaid is asking this Court to give him the benefit of any doubt that was created by any of his conduct on January 6. Mr. Kincaid has been able to live without issue in the community while this case is pending and during his life, and that is because he is not a danger to the community and his history is a clear indicator that he can live in the community successfully. Any period of imprisonment will present no additional deterrence to Mr. Kincaid or society beyond what has already been accomplished. Even more, whether after any period of incarceration or directly on probation after this sentencing, Mr. Kincaid understands he will continue to be supervised by the government in any event and that ongoing supervision alone in this case is a general *and* specific deterrent. It likewise also serves as ongoing protection for the public to the extent there is any concern in this area, which there genuinely should not be.

### (c) Retribution

Retribution is essentially punishing Mr. Kincaid for committing criminal conduct. Although the word punishment or retribution does not appear in the government's memorandum, this sentencing purpose often will represent the most basic justification for imposing a sentence of incarceration – that is, that Mr. Kincaid has violated society's rules and that it is moral and just to punish him for the transgression. Here, as stated above, Mr. Kincaid understands he will be punished because his conduct broke rules – the law. While punishment can be seen as a restoration of the proper balance between a law-abiding citizen and a transgressor, Mr. Kincaid has been a law abiding citizen his entire life. While punishment may be the most basic justification for putting Mr. Kincaid behind bars, for any period of time, it should be balanced with the remaining purposes. Once balanced here, Mr. Kincaid submits respectfully that incarceration is not necessary. Mr.

Kincaid will now have a federal criminal conviction on his record for his actions on January 6 and he will have to deal with this the rest of his life. He has been and will continue to be monitored by the government. A sentence that is "sufficient but not greater than necessary" will allow him to return to his wife and home and trust that the Court has considered Mr. Kincaid's history of showing respect towards the law his entire life but recognizing that he made a mistake on January 6.

### Factor 3: The Kinds of Sentences Available

Although we know that imprisonment is not an appropriate means of promoting correction and rehabilitation, Mr. Kincaid simply does not need any correction or rehabilitation.  *See* 18 U.S.C. §3583(a).  The Court must consider a wide range of alternatives to imprisonment to fashion a just sentence. Structuring a sentence that allows for Mr. Kincaid to return to his home residence in the District of Colorado and be with his wife, both of whom are at an advanced age and depend on each other, grieving the loss of their adult son and struggling with their own health conditions, is a sentencing option this Court can facilitate. This can be facilitated by a probation sentence or a sentence to home detention or a thoughtful combination of the two. The United States Probation Office, as an arm of this Court, is in the business of thoroughly investigating defendants like Mr. Kincaid including his background and involvement in the case and what sentencing approach they believe should be recommended to this Court in light of same and considering many factors such as the safety of the community. In this case, Probation has recommended a period of probation of three years. Incarceration or home detention is not recommended. Counsel is confident Mr. Kincaid will have no issues with ongoing probation supervision irrespective of whether the duration of same is one year or three years and will defer to the Court on the appropriateness of the length of same, if the Court were to impose such a sentence. Mr. Kincaid understands that the length of his probation is another aspect driven by the goals of sentencing, such as punishment and deterrence.

For its part, the government argues that Mr. Kincaid be sentenced to two months incarceration and one year of supervised release. This argument reveals at least two things: (1) that despite painting a very grim picture of Mr. Kincaid in a twenty page sentencing memorandum, the government does believe, and for various reasons, that Mr. Kincaid should still serve a shorter sentence of imprisonment on the shorter end of the advisory range, if such is imposed and (2) that the government appears to agree that Mr. Kincaid doesn't need lengthy community supervision, asking for only one year of supervised release if there is a sentence to imprisonment. In this case, when this Court weighs the various factors and balances Mr. Kincaid's individual characteristics versus society's interest in safety and deterrence, a sentence of incarceration will not be productive. Indeed, we don't want this case to be an example of how a longer incarceration sentence (for someone like Mr. Kincaid, even one or two months) could actually have a negative effect on Mr. Kincaid (including on his health, mental health, and ability to be fully successful upon release) and one that could do more harm ultimately (to him and his wife, family, community), than good. Nobody wins in that situation.

### Factors 4,5, and 6: The Sentencing Guidelines and Policy Statements, all advisory, and Avoiding Disparity in Treatment of Similar Offenders

As this Court is aware, courts are free to categorically disagree with the Sentencing Guidelines' recommended sentence in any particular case and may impose a different sentence based upon a contrary view of what is appropriate under Section 3553(a). This includes the freedom to merely disagree with a Sentencing Guidelines' computations and the policy decisions that are contained in the Guideline. *Pepper v. United States*, 131 S.Ct. 1229, 1241 (2011); *Spears v. United State*s, 129 S.Ct. 840, 843 (2009).

With respect to the Sentencing Guidelines in this case, Mr. Kincaid has addressed the application of same briefly above in this memorandum and also in *Defendant's Objections/Clarifications to Presentence Report* [ECF # 32], which is incorporated by reference. As previously noted, no matter

how the Court resolves any disputes with respect to the appropriate calculation of Mr. Kincaid's total offense level in this case, his ultimate advisory range will remain at 0-6 months.

### (a) Obstruction of Justice Enhancement

Pursuant to U.S.S.G. § 3C1.1, Probation adds a two level enhancement to Mr. Kincaid's offense level computation based on the assertion that Mr. Kincaid obstructed justice by denying he destroyed any property at the U.S. Capitol during an FBI interview on August 28, 2021. [ECF. 31] at para. 39. In sum, Mr. Kincaid's position is that the FBI never asked him if he damaged any property at the Capitol but only whether he assaulted officers or participated in violence. In the context of that conversation with the FBI, Mr. Kincaid was not equating violence with property damage. Mr. Kincaid asserts this attempt at an additional two level increase is moored in the speculation about whether Mr. Kincaid lied to the FBI. He did not. More detailed argument is provided in Mr. Kincaid's PSR objections; however, the government acknowledges in its sentencing memorandum that it cannot prove what is necessary for this obstruction enhancement to apply and disagrees with Probation's proposed enhancement in this area. Thus, the enhancement proposed by Probation for obstruction should not be included in this Court's final offense level calculation.

### (b) U.S.S.G. § 4C1.1

Probation asserts the otherwise applicable zero point offender adjustment (reduction) permitted by U.S.S.G. § 4C1.1 should not apply to Mr. Kincaid because he used violence or credible threats of violence. [ECF # 31] at para. 43. The government agrees. [ECF #33] pg. 9. Mr. Kincaid has proposed that the zero point offender adjustment (reduction) permitted by U.S.S.G. § 4C1.1 applies to reduce his total offense level calculation, which, if the Court were to agree, would put his total offense level at 2. Counsel has recognized even in Mr. Kincaid's objections that this could be a simple conclusion for certain Courts and a closer call for other Courts depending on how the guideline is interpreted and applied. More detailed argument is provided in Mr. Kincaid's PSR

objections; however, the Court must determine one question: in taking a baton numerous times to a House Chamber Door, did Mr. Kincaid "use violence or credible threats of violence" within the meaning of § 4C1.1? If so, Mr. Kincaid doesn't qualify for the reduction and his total offense level should be 4. If Mr. Kincaid didn't "use violence or credible threats of violence", Mr. Kincaid does qualify for the reduction and his total offense level should be 2. Property damage is not listed as a disqualifier.

<u>Factor 7</u>: The Need to Provide Restitution

Mr. Kincaid will abide by any order of this Court to pay restitution. The parties have agreed to $500.

<u>CONCLUSION</u>

This Court should follow the parsimony clause of 18 U.S.C. § 3553(a) and impose the lowest sentence that is sufficient to meet the goals of deterrence, protection of the public, and respect for the law. Probation has recommended that probation supervision with no incarceration or home detention is an appropriate sentence. Mr. Kincaid agrees. *Any sentence* that this Court imposes will send a strong message. If the Court determines it must incarcerate Mr. Kincaid, he asks that the Court consider a period of home detention in lieu of same. If incarceration is a must, he asks that the Court only do so for a period that is "sufficient but not greater than necessary" and certainly no more than the government's two month recommendation. In any event, Mr. Kincaid would also request that he be permitted to return to his home state in the District of Colorado and self-surrender for any incarceration sentence imposed. All things considered;, such a sentence is certainly within the range of what is sufficient but not greater than necessary to accomplish the goals of sentencing in this case.

**RESPECTFULLY SUBMITTED** this 13th day of August 2024.

DEFENDANT CLIVE KINCAID

21

By:   s/ *Ryan E. Brungard*
Ryan E. Brungard
DSB, PLLC
1010 Main Avenue
Durango, Colorado 81301
Telephone: (970) 247-4545
Email: rbrungard@trialdurango.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of August 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

Tighe.Beach@usdoj.gov

*s/ Kathleen Costello*
Kathleen Costello
Legal Assistant
DSB, PLLC
1010 Main Avenue
Durango, Colorado 81301
Telephone: (970) 247-4545
Email: kcostello@trialdurango.com

23