**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

        Plaintiff,

     vs.

CLIVE A. KINCAID,

        Defendant.
_____/

Criminal Action
No. 1:23-308

Washington, DC
August 15, 2024

12: 34 p.m.

TRANSCRIPT OF SENTENCING
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the Plaintiff:**     **Tighe Beach**
                        AUSO - D.C.
                        601 D Street NW
                        Washington, DC  20001
                        Email:  tighe.beach@usdoj.gov

**For the Defendant:**    **Ryan Brungard**
                        DUTHIE SAVASTANO BRUNGARD, PLLC
                        P.O. Box 219
                        Durango, CO  81302
                        Email:  rbrungard@trialdurango

**Reported By:**           **Lorraine T. Herman, RPR, CRC**
                        Official Court Reporter
                        U.S. District & Bankruptcy Courts
                        333 Constitution Avenue NW
                        Washington, DC 20001
                        lorraine_herman@dcd.uscourts.gov

*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

1           **P R O C E E D I N G S**

2           **DEPUTY CLERK:**  Good afternoon, Your Honor.  This

3    is criminal case year 2023-308, *United States of America*

4    *versus Clive A. Kincaid.*

5           Probation officer is Isabel De La Riva.

6           Counsel, please come forward and introduce

7    yourselves for the record, beginning with the government.

8           **MR. BEACH:**  Good afternoon, Your Honor.

9    Tighe Beach for the United States.

10          **THE COURT:**  Mr. Beach.

11          **MR. BRUNGARD:**  Your Honor, good afternoon.

12   Ryan Brungard present with my client, Mr. Clive Kincaid, who

13   appears out of custody.

14          **THE COURT:**  Mr. Brungard and Mr. Kincaid.

15          We're here to sentence the defendant on the

16   one count to which he pleaded guilty.  Are both parties

17   ready to proceed?

18          **MR. BEACH:**  Yes, Your Honor.

19          **MR. BRUNGARD:**  Yes, Your Honor.

20          **THE COURT:**  So just a little roadmap and a

21   statement for everybody about what I did to prepare for

22   today.

23          I reviewed Probation's pre-sentence investigation

24   report and recommendation, various pretrial services

25   reports, the sentencing briefs submitted by both parties and

1    the exhibits submitted by the government, to include video

2    exhibits.

3        Before we begin, does anyone have anything to add

4    to those materials that I should be aware of, just the

5    written materials?  Obviously, we'll have a discussion

6    today.

7        **MR. BEACH:**  No, Your Honor.

8        **MR. BRUNGARD:**  Your Honor, you may have said this.

9    We did file objections to the PSR, I think, really one of

10   which needs to be resolved, it sounds like, but that was

11   ECF, pardon me, 32.

12       **THE COURT:**  Oh, yes, I intend to go through the

13   PSR and the objections in a minute.  So, yes, I have noted

14   those.

15       Here's how I intend to proceed.  I'm going to

16   first consider objections to the findings contained in the

17   PSR and make my findings with respect to those disputes.

18   I'll then go through the guidelines calculation.

19       I will then hear from counsel about the sentence I

20   should impose as well as Mr. Kincaid, if he wishes to speak.

21   It sounds, from the sentencing brief, like he does and I'm

22   happy to hear from him at that time.  And then, if anyone

23   else would like to speak on his behalf, they're welcome to

24   do so.  And then I will pronounce the sentence.

25       Turning to the PSR, it does appear that there are

1    some outstanding objections to it.

2         Mr. Brungard, you want to come up to the podium

3    and we'll have a discussion about them or the one important

4    one from your perspective.

5         **MR. BRUNGARD:**  So, I think, one, Your Honor, if I

6    may, we might be able to put to rest fairly quickly and

7    that's the obstruction enhancement.

8         **THE COURT:**  Yeah.

9         **MR. BRUNGARD:**  It doesn't appear the government is

10   inclined to move forward on that.  I don't really have any

11   further argument if that's where the Court is, unless the

12   Court wants to hear from me.

13        But I believe it's inappropriate for all of the

14   reasons I wrote in the memorandum.  I certainly can discuss

15   anything and everything about it.  Really what it centers on

16   is essentially very minimal language and dialogue with the

17   FBI back in August of '21.

18        **THE COURT:**  Right.  I listened to that, listened

19   to the salient parts for sure of that interview.

20        **MR. BRUNGARD:**  Okay.  And the part that I

21   typically am referring to, I think, is about 26 minutes

22   in --

23        **THE COURT:**  Yes.

24        **MR. BRUNGARD:**  -- where it's difficult

25   because -- it's always difficult in retrospect, but there's,

1   you know, Agent John Smith is talking fairly quickly.

2   Mr. Kincaid is answering questions fairly quickly.

3          So that, you know, kind of, Be honest with me.

4   Did you assault any officers?  Did you engage in violence?

5   And there was kind of, No.  No.  No.  Over that.

6          From my perspective, the property damage piece

7   just never came up.  And I wrote this in the memorandum,

8   Your Honor.  There is no doubt, if the FBI was aware of the

9   property damage, they would have asked him, and I don't

10   think we'd be here arguing this.  I think we'd have a

11   concern about, you know, an obstruction enhancement, if he

12   were to decline and say, no, he didn't do that but it just

13   never came up from our perspective.

14          **THE COURT:**  So perhaps I can hear from Mr. Beach

15   very briefly, because the government's brief seemed to say

16   two different things about this enhancement and maybe

17   one was in error.  But the following statements were in the

18   government's brief.

19          "The government respectfully disagrees with the

20   guidelines calculation set forth in the PSR pertaining to

21   obstruction of justice.  While Kincaid's lie was

22   obstructive, it should certainly play a role in sentencing.

23   The government cannot affirm that the false statement

24   impeded this particular investigation in such a significant

25   way."

1          But then later says, "The PSR correctly determined

2     that Kincaid's lie to the FBI regarding this violent and

3     destructive act constituted obstruction of justice."

4          Maybe the easiest thing to ask is, What does the

5     government presently believe is the appropriate outcome as

6     to that enhancement.

7          **MR. BEACH:**  Apologies for the dissonance,

8     Your Honor.  The second statement might have been in error.

9     I'm not sure unless you point me to the page.

10         But while we disagree about why --

11         **THE COURT:**  One's at 9 and one's at 10.

12         **MR. BEACH:**  Ten.  Okay.

13         Apologies.  One moment.

14       (Brief pause.)

15         I'm sorry, Your Honor.  That last sentence on 10,

16     I believe, is in error.  This is a complicated issue.  I

17     believe defense and I might come to the same result but for

18     different reasons.

19         **THE COURT:**  Yeah.

20         **MR. BEACH:**  Defense suggests that there was no

21     dishonesty going on in the interview.  We disagree.  But we

22     believe the enhancement is not appropriate because that

23     dishonesty did not lead to significant obstruction in the

24     investigation.

25         **THE COURT:**  Right.  There may be different reasons

1    to get to the same place from the government's and the

2    defendant's perspective, but you both land on the same

3    outcome, which is that you both believe the enhancement is

4    inapplicable.

5              **MR. BEACH:**  That is correct, Your Honor.

6              **THE COURT:**  Fair enough?  Okay.

7              So just to cut to the chase, I agree with that

8    outcome.  I mean, I realize -- and I appreciate, as always,

9    the PSR took a different view, which is, of course, very

10   appreciated by me because I want independent looks at these

11   things.

12             But my review of the audio file suggests to me

13   that the question was strongly implying actions directed

14   against persons rather than property, A.  And so it's not

15   even clear to me that it was an answer that was obstructive

16   at all or an incorrect statement in context.

17             And in any event, I think the government's

18   position is well taken on the effect of it.  So I'm not

19   going to be applying that enhancement.

20             **MR. BRUNGARD:**  Very good.

21             The second one, Your Honor, is really somewhat

22   related 'cause we're talking again about property damage

23   versus, you know, credible threats of violence or violence

24   itself.

25             I agree with the government.  The government wrote

1   in their memorandum that, you know, really this is an issue.

2   Again, both of these don't change the underlying range.

3           **THE COURT:**  Right.

4           **MR. BRUNGARD:**  They're important enough for me,

5   because I think that language in the guidelines with respect

6   to the zero-point offender are important and, I believe,

7   should be applicable to Mr. Kincaid.

8           What I've done, Your Honor -- and really in my

9   sentencing memorandum, I kind of just threw it out as really

10  the Court needs to resolve one question.  And the only

11  suggestion of any sort of violence or credible threats of

12  violence was the action by Mr. Kincaid at the House Chamber

13  door with the baton.

14          I respect and understand, as I've looked into this

15  issue since my objections, that it could just be at a

16  fundamental level that certain courts say, absolutely,

17  there's no question about it.  How can taking a baton to the

18  House Chamber door not be violence?

19          However, I wanted to look a little bit further

20  into that, and I did look at a case that this Court recently

21  ruled on.  And that was the *Joshua C. Doolin* case,

22  21-cr-447.  And I thought that case was particularly

23  interesting, and I think ultimately, however the Court

24  resolves this, we're fine with it.  But I did want to make

25  the record.

1        And with respect to the *Doolin* matter, the Court

2    starts its order by finding that Mr. Doolin joined a crowd

3    of rioters who breached the Capitol.  He had stole a police

4    riot shield, which he passed on to other rioters, and

5    participated in what we've heard in other cases this sort of

6    heave-hoe, kind of shoving in tunnels, things like that.

7        And so this exact question was presented in this

8    case and the Court resolved it.  And so Doolin, in that

9    case, argued that the reduction was appropriate because he

10   didn't punch, kick, grab or throw anything -- any objects at

11   law enforcement officers.

12       The government disagreed and said he used a riot

13   shield to forcefully push through, you know, with the mob

14   that had gathered there.  The government did concede,

15   however, there was no direct physical contact with police

16   officers.

17       In this case, we have no direct contact with

18   police officers, other than people walking by, shoulders,

19   things like that, but not in the context of what would be

20   considered violent under any definition.

21       So the Court ultimately determined in that case,

22   this was an order -- this is ECF-313 that I'm referring to,

23   Your Honor, that Doolin, in that case, did not engage in

24   violence within the context of 4C1.3.

25       The Court discussed briefly sort of this

1    suggestion that the government's argument about violence by

2    simply being present there was inappropriate for it to apply

3    here.

4         You know, very similar to Doolin in this case,

5    Mr. Kincaid simply just did not use any violence as it

6    relates to officers or other people.  And so I think it

7    would have been very, very clear for the Sentencing

8    Commission to define what that means instead of leaving it

9    open for interpretation what violence or credible threats of

10   violence mean.  They certainly could have added one very

11   specific subsection that says property damage and they

12   didn't.

13        So I think it was enough, with me understanding

14   that this could, for lack of a better way of saying this,

15   kind of fall on deaf ears.  I wanted to at least get this

16   out here.  So we do believe it should apply, ultimately

17   resulting in a total offense level of 2, again, not changing

18   necessarily anything else.

19        **THE COURT:**  Thank you, Counsel.

20        Let me ask you while you're still up.

21        **MR. BRUNGARD:**  Sure.

22        **THE COURT:**  Obviously, these are primarily

23   arguments about -- well, especially when you put the

24   obstruction question to the side, which does depend on my

25   view or reading of the interview, what was said, and the

1    like.

2              But when it comes to this question, this is really

3    a guidelines question rather than an objection to the facts

4    as found in the PSR.  Correct?

5              **MR. BRUNGARD:**  Correct.

6              **THE COURT:**  Yeah.  So do you have any, just while

7    you're up here, any other -- put it this way -- objections

8    to the facts or the factual findings contained in the PSR?

9              **MR. BRUNGARD:**  No objections.

10             **THE COURT:**  Okay.  Thank you.

11             Mr. Beach, why don't we hear from you a little bit

12   on this question, the zero-point offender.

13             **MR. BEACH:**  Your Honor, the 4C1.1 should not apply

14   because, while assaulting the House Chamber door with a

15   baton 11 times, the defendant used violence disqualifying

16   him from that reduction.

17             The definition of "use of violence" isn't

18   provided, but other courts have come to and we agree that

19   the definition should be the use of physical force typically

20   accompanied by fury, vehemence or outrage.  The guidelines

21   do not say that the violence has to be against a person.  It

22   doesn't say who or what the violence is against.

23             So we would argue that the violence can be against

24   property alone, if it is physical force, typically

25   accompanied by fury, vehemence or outrage.  And for that

1    reason, the Court should not apply the reduction.

2              **THE COURT:**  Thank you, Counsel.

3              Let me just start by -- before I get to the

4    guidelines calculation in particular, my resolution of that

5    question that we've just discussed, let me just ensure that,

6    procedurally, Mr. Kincaid had had an opportunity to review

7    the PSR and discuss it with counsel.

8              So, Mr. Kincaid, just make sure that you're close

9    to the microphone.  Have you had a chance to review the PSR

10   with your counsel?

11             **THE DEFENDANT:**  Yes.

12             **THE COURT:**  Did you have enough time to talk to

13   him about that report and the briefs that have been filed?

14             **THE DEFENDANT:**  Yes.

15             **THE COURT:**  Are you completely satisfied with his

16   services?

17             **THE DEFENDANT:**  Yes, I am.

18             **THE COURT:**  So, as it relates to the factual

19   findings contained in the PSR, pursuant to Rule 32, I adopt

20   them and accept them as it relates to the circumstances of

21   the offense, as, I guess, modified or in light of my

22   statements about my own independent review of the audio file

23   from the interview that we were discussing as to the

24   obstruction of justice question.

25             So I accept the rest of the PSR with that slight

1    modification for purposes of both my guidelines analysis and

2    my ultimate sentencing determination.

3            And just so the record is very clear, I think that

4    the various statements in Paragraph 27, the factual

5    statements, are correct.  The Paragraphs 31, 39 and 86, I've

6    already talked about and I am just going to address those

7    briefly as I go through the guidelines analysis.  And then

8    the same with respect to Paragraph 43, which is really a

9    calculation under the guidelines question.

10           So turning to the guidelines, under *Booker*, of

11   course the guidelines aren't mandatory.  They're advisory

12   but I must both calculate them correctly and then consider

13   them.

14           As we've discussed today, there is no disagreement

15   among the parties and probation about the relevant

16   guidelines range, although people differ about how they get

17   to that range.  And I have an independent duty to both

18   verify the range and to walk through why I believe it's the

19   correct one, which parenthetically I do, and here's why.

20           The relevant guideline provision is 2B2.3 and the

21   parties, everyone agrees, and I do as well, that the base

22   offense level is 4 under 2B2.3(a).

23           A two-level increase then applies because

24   Mr. Kincaid trespassed on restricted building or grounds.

25   That's 2B2.3(b)(1)(A).  The offense level rises to 6.

1    The next question was the one that we already

2    discussed and have already resolved orally at least, and

3    that is whether Mr. Kincaid obstructed justice and whether

4    an increase is applicable under 3C1.1.  As I've held, I

5    don't think Mr. Kincaid's conduct rises to the level of such

6    obstructive conduct.  And therefore, I will not apply that

7    enhancement, keeping the offense level at 6.

8    He does receive a two-level downward adjustment

9    for acceptance of responsibility under Section 3E1.1(a).

10   Everyone agrees on that.

11   That gets us to the question of whether he is

12   eligible for a two-level downward adjustment under 4C1.1.

13   That adjustment, as everyone agrees, is not available for

14   those who "used violence or credible threats of violence in

15   connection with the offense."

16   The government's argument is that Mr. Kincaid used

17   violence against property when he hit the House Chamber door

18   windows with a baton 11 times with sufficient force to break

19   those windows.

20   I agree hitting the House Chamber door is violent

21   in a number of ways.  It's a menacing act that places

22   others, including officers and members of Congress on the

23   other side of the door, in fear of imminent harm.  It's the

24   intentional act that does damage to the door or certainly

25   risks damage to the door.  And it happened to place other

rioters at risk of physical harm if Mr. Kincaid were to miss the door.

I realize that I resolved a request in the *Doolin* matter for a similar adjustment. But there, really the argument that I was addressing was the government's position that, by being present at the Capitol, as some have put it, the government's violence-by-presence theory that that was enough, I don't think that's enough, but here we have much more. Mr. Kincaid acted violently, in my view, toward the relevant door. As a result, the total offense level stays at 4.

Everyone agrees, as do I, that Mr. Kincaid falls within Criminal History Category I; that results in a guidelines range of 0 to 6 months incarceration and a supervised release term of at most one year. There's an applicable fine range under 5E1.2(c)(3) of $1,000 to $9500, a mandatory special assessment of $25. And Mr. Kincaid had agreed to pay $500 in restitution.

I'll probably say this again when I pronounce the sentence, but this isn't one of those circumstances where the guidelines range would have been different depending on my determination of that enhancement that the -- or sorry, the zero-point offender reduction.

The range would stay the same, but of course the component parts that lead to the range would have been

1    different if I had given Mr. Kincaid the benefit or had

2    concluded that that zero-point offender provision was

3    applicable.

4        I do think I can say very safely here that,

5    whether the offense level was 4 or the offense level was 2,

6    resulting in, of course, the same guidelines range and that

7    being just one factor that I have to consider in imposing

8    the sentence here, and in light of my view that the

9    guidelines don't do a ton of work in these particular kinds

10    of January 6 cases, and also my view that what really

11    matters is obviously, in any case, I consider all of the

12    facts and the like, but also the consideration of things

13    like unwarranted sentencing disparities where I've now

14    sentenced more than 50 people for January 6 conduct.

15        I can safely say, in this case, that it would not

16    have mattered to my ultimate disposition whether that

17    zero-to-six-month range was the result of a four-offense

18    level, zero-offense level or a level 2.

19        So with that, let's proceed to step three, which

20    is each party telling me why their proposed sentence is an

21    appropriate one.  We'll start with the government.

22        **MR. BEACH:**  One moment, Your Honor, while I plug

23    in here.  There we go.

24        **THE COURT:**  Counsel.

25        **MR. BEACH:**  Thank you, Your Honor.

1          The Court is presented with a unique sentencing

2    decision.  While the defendant pled to 1752(a)(2), a

3    misdemeanor, we have presented evidence of and the defendant

4    admits to violent conduct that would have justified a felony

5    charge if it had been discovered earlier.

6          While the case is mitigated by the defendant's age

7    and health, the Court must fashion a sentence that addresses

8    the severity of his conduct, especially of his assault on

9    the House Chamber door.  For this reason, we recommend a

10   sentence of 60 days imprisonment with 12 months supervised

11   release.

12         Sorry, there's a delay on this slide here.

13         The defendant drove to Washington D.C. alone to

14   attend the Stop the Steal Rally, but he found the former

15   President's speech to be boring and left to join the mob

16   descending on the Capitol.

17         After crossing into the restricted area, the

18   defendant ascended the northwest scaffold stairs, an active

19   construction site at the time, at the front of the rioters.

20         And can the Court see the video now?  Okay.

21         He stayed at the front, despite obvious violence

22   from the mob against officers and despite being shot six

23   times with rubber bullets.

24     (Video played.)

25         There's audio from my computer but --

1          **THE COURT:**  I can hear it.

2          **MR. BEACH:**  Okay.

3      (Video continued playing.)

4          **MR. BEACH:**  Your Honor, in that clip, we saw or we

5      heard rioters near and behind the defendant who you see in

6      the center of the screen shouting things like "You better be

7      fucking scared" and "Death to tyrants."

8          We also saw the rioters behind the defendant

9      pulling a metal barricade which the defendant had his hands

10     on away from the officers, and the officers were swinging

11     their batons at the barricade to try to prevent them from

12     doing this.

13         He stayed at the front despite this violence

14     around him, and he stayed at the front despite being shot

15     with the rubber bullets.  He stayed at the front after being

16     sprayed with pepper spray shot by a rioter behind him toward

17     the officers.  He occupied the attention of the officers who

18     were desperately needed to hold the line, including the

19     officers who provided him aid after being sprayed.

20         Now, outside the east Rotunda door, after

21     ascending to the Upper West Terrace, the defendant again saw

22     rioters use violence to breach a police line.  This time he

23     saw an officer collapse at his feet after being crushed by

24     the mob.  The defendant entered the building anyway.

25         (Video played.)

1          **MR. BEACH:**  Inside the building the defendant

2     again pushed to the front of the mob and spoke with officers

3     at a critical breach point, this time the Statuary Hall

4     connector hallway.

5               Finally and most importantly, the defendant pushed

6     to the front of the mob at the House Chamber doors.  After

7     the officers there had been forced to retreat, the defendant

8     saw another rioter use a baton to break the windows on the

9     right door.

10         (Video played.)

11         **MR. BEACH:**  Here, you can see officers being

12    physically removed.

13         (Video continued playing.)

14         **MR. BEACH:**  The defendant grabs the baton from

15    another rioter.

16         (Video continued playing.)

17         **MR. BEACH:**  And you can hear at least eleven

18    strikes against the window there from the defendant.

19              We saw the defendant swing the baton.  It had to

20    be about waist height at the window on the left door.

21    Afterwards, we see a hole where the defendant had been

22    assaulting the door, roughly where someone would make one if

23    they were going to attempt to reach through and unlock the

24    door.

25              These assaults on the doors compel the Capitol

1  Police Officers inside to draw their firearms.  There were

2  House members sheltering inside at the time.

3          The defendant finally retreated when he saw these

4  drawn firearms through the windows or at least that's what

5  we can surmise from this video.  Here is the hole the

6  defendant broke right next to the handle or push plate there

7  on the left door.

8          And here is the view the defendant likely saw

9  through the window.  These are through the holes on the

10  right door.  That's a Congressman on the left side of the

11  screen and a Capitol Police Officer on the right with weapon

12  drawn and pointed.

13          This is an indelible image of an attempt to block

14  the peaceful transfer of power.  This is the result of

15  political violence.

16          There are significant statements and arguments

17  made by the defendant that show that he still lacks remorse

18  for his conduct on January 6th.  He still argues that his

19  intentions were peaceful, that he "had nothing but good

20  intentions" and that he was only attempting to "de-escalate

21  the situation."

22          But the assault on the House Chamber directly

23  refutes this.  He escalated the violence.  He only gave up

24  when faced with drawn handguns.

25          The defendant also continues to fail -- continues

1    to lack remorse in that he doesn't admit that his repeated

2    and intentional leadership at the front of the mob

3    obstructed officers and encouraged the rioters forward.

4           The officers who gave him aid on the northwest

5    scaffold could have helped hold the line.  Intentionally or

6    not, the defendant occupied and distracted the officers from

7    addressing the violence of other rioters at many of these

8    breach points.

9           This is a difficult and unique case to draw

10   comparisons for because of the context that I've outlined.

11   But here are two cases from this Court that are similar in

12   some ways.

13          In *Derek Andrew Nelson*, the Court sentenced the

14   defendant to 75 days incarceration.  That defendant was

15   present at two of the same breach points, the scaffold and

16   the House Chamber door, and that defendant was different in

17   some more aggravating ways in that he prepared for violence

18   and did physically confront an officer, but both minimized

19   their conduct and lacked true remorse.

20          Now, while the defendant didn't physically

21   confront an officer directly, as the Court has already

22   addressed, the assault on the window is violent, it's

23   physical and it's a threat to whoever might be on the other

24   side of that door.  And as we know, there were officers and

25   Congresspeople on the other side of that door.

1    Kurt Peterson was sentenced to 45 days

2    incarceration.  They're very similar in that they both broke

3    windows, but the defendant's conduct is significantly more

4    aggravated because of which window he broke and because of

5    his actions at the front of the mob at multiple different

6    breach points.

7    But Peterson broke a random window that, as far as

8    I know, no one was trying to get through, per se.  But the

9    defendant broke the window of the House Chamber door.

10    Explicitly, the crowd behind him, the mob, was chanting,

11    "break it down, break it down," and that's what he tried to

12    do.  It's an extremely significant breach point.  It's

13    significantly more aggravated than Peterson.

14    **THE COURT:**  It seems to me -- and this will be

15    something that I'll want the defendant or defense counsel to

16    address -- that, when it comes to the defense proposal that

17    I give the defendant a merely probationary sentence, I'm

18    confronted with the following conclusions I've already

19    drawn, which is that, certainly, as compared to people who

20    I've sentenced to just probation, the defendant's conduct on

21    January 6 was substantially more serious than those people

22    for all the reasons you've articulated.

23    But or on the other hand, the people who I have

24    sentenced in the 30-to-75-day range, haven't been -- they

25    either have had more significant criminal histories than the

1    defendant here or have been substantially younger.  And it

2    seems to me that I'm forced -- or I mean I know that this is

3    what we do.  But this is a case that presents the balancing

4    between the seriousness of the conduct on January 6th on the

5    one hand and the age, unlikely recidivism and the like on

6    the other.

7            So I am there with you, for lack of a better word,

8    on the seriousness of the conduct on January 6.  I don't

9    think there's any real dispute about that.  Well, there

10   shouldn't be in my view.

11           And the question in my mind is, Where do the other

12   sentencing factors lead us to in light of, really, the

13   defendant's personal history, current age, current living

14   situation and the like.  And, you know, ultimately, what

15   goal does a period of incarceration serve here?

16           **MR. BEACH:**  Yes, Your Honor.  Considering the

17   mitigators is a critical part of this analysis.  And that is

18   why I believe the case is slightly mitigated as compared to

19   Derek Nelson.

20           Now the conduct is such -- significant enough that

21   the Court must prioritize not only specific but general

22   deterrence.  And a sentence of incarceration is necessary to

23   do that, in our view.  Where you fall on the number is

24   tough.  I mean, that's where -- that's where it's difficult.

25   I mean, the defendant's age, the defendant's health issues,

1    these are significant mitigating factors.

2         And all that being said, it's more than

3    just -- his conduct is in the ballpark of these cases, if

4    not more serious, and that's what I've argued for *Peterson*.

5    How far -- how much the Court weighs the mitigators, I can't

6    say too much other than obviously it's a concern.

7         But the goal here is important, and that is to

8    prevent anything like this from ever happening again.  Not

9    just this defendant but all of them, hundreds, possibly

10   thousands.

11        **THE COURT:**  Right.  We can't be in a world where

12   the next 73-year-old does what Mr. Kincaid did here.

13        **MR. BEACH:**  Correct, Your Honor.

14        And there are calls out there for this to happen

15   again coming from prominent people.  The system has been

16   shaken.  And we have another certification coming up this

17   January and there will be another four years after that and

18   another four years after that.

19        And what the Court does in these cases,

20   specifically in the cases like this one, where it's violent

21   and it's specifically targeted to force that political

22   violence toward an end, is important.

23        So that's why we think 60 days is appropriate

24   because we think this conduct is that serious and

25   the -- obviously the range is 0 to 6 months.  And we think

1    that 60-day number takes into consideration those

2    significant mitigating factors.

3                    If I might conclude?

4            **THE COURT:**  You may.

5            **MR. BEACH:**  Thank you.

6                    As I've said, this is a unique and difficult case

7    to sentence.  But given the seriousness of the defendant's

8    conduct at the front of the mob on January 6th, and

9    especially his violent assault on the House Chamber door,

10   the Court can only achieve the necessary, specific and

11   general deterrence through a sentence of 60 days

12   incarceration, 12 months supervised release, a fine of $876

13   for the door window, the special assessment and the

14   restitution of $500.  Thank you.

15           **THE COURT:**  Thank you.

16           Mr. Brungard?

17           **MR. BRUNGARD:**  Thank you, Your Honor.

18                   First, I want to say it's a pleasure to be here in

19   person.  I've never been to D.C.  I appreciate, again, the

20   government and the Court allowing us to proceed virtually

21   prior to today.

22                   I've got a small -- this isn't going to be about

23   me but just a little bit about me.  I've got a small private

24   practice in Durango, two law partners.  I do civil and

25   criminal litigation.

1          Part of my criminal defense, a fraction of it, is

2   federal work, and I do a lot of CJA work too as well.  Being

3   in southwest Colorado, six hours southwest of Denver, I

4   never thought I was going to have a January 6th case.

5          I met Mr. Kincaid soon after his interview in

6   August of '21, a good handful of months after January 6.  He

7   was looking for an attorney because he had known at that

8   point that he had talked to two FBI agents.  He stayed in

9   touch with them.  He shared the information that he had to

10  stay in constant contact with them.

11         And over the past few years and at no fault to the

12  government, we've gone through a handful of different

13  prosecutors.  Mr. Kincaid basically has been living with

14  this since January 6 as he should, but certainly knowing

15  more than just what he did, he was very much being

16  investigated for the last handful of years despite charges

17  not occurring until, I believe, September of '23.

18         What I can tell the Court is that I don't always

19  have the privilege to say this with all of my clients, but

20  this is one of the more engaged clients I have ever had, and

21  I think there's lots of different reasons for that.  One, he

22  is older.  He's 76 years old.

23         He's not been in this courtroom, like many prior

24  offenders have, unfortunately and seem to come back in.  He

25  doesn't know the process.  He knows the process probably

1    like the back of his hand at this point, but he's been

2    incredibly engaged and taken this incredibly seriously --

3    incredibly serious, pardon me, Your Honor, all the way

4    through this, including through today.  And he does -- would

5    like to address the Court.

6          And I do understand and I've been through enough

7    of these where I understand the Court has done his due

8    diligence.  So I'm not going to sit here and talk about my

9    sentencing memorandum at length.

10         But there's two big things that I have to address

11   and it's also not -- it's complicated in terms of this

12   Court's ultimate decision with respect to incarceration.  I

13   would agree.  And I don't envy that position that you're in,

14   Your Honor.

15         But otherwise, it's not an incredibly complicated

16   case.  Two big complications that I have to address from my

17   perspective, one is why didn't Mr. Kincaid turn around and

18   go home?  Why?  I have been asking him this every other time

19   we meet since we've started meeting in 2021.

20         Wouldn't the reasonable person, once you're

21   moving, you know, with this group, what's been referred to

22   as a mob, especially at his age who is not a violent person

23   or anything like this, by himself, turn around and just go

24   back to his apartment?  I've really, really struggled with

25   this.

1          I can understand now, having been here for a week.

2    And I haven't gone in the Capitol, Your Honor, but I've

3    visited the grounds and the magnificence of the Mall and all

4    of this.  And I try to put myself in my client's shoes so I

5    can try to understand what was going on and I can understand

6    why there would be this magnetic draw with the crowd towards

7    the Capitol.  I can understand that.  And there's nothing

8    wrong with him coming down to listen to a speech.

9          Even getting to the point where you walk into the

10   Capitol doors -- and again, I personally wouldn't do this

11   but I can see how people -- the doors are open, people have

12   already breached it, you walk in.  I can see a person that

13   would be considered reasonable doing that.

14         But after getting shot with rubber bullets,

15   Your Honor, six times, I believe multiple times in the face,

16   close to his eyes, and then proceeding to move forward after

17   that and then being pepper sprayed, you know, how do you not

18   go back after the rubber bullets and how do you proceed

19   outside the Capitol after you spend 25 minutes with a young

20   Capitol Police Officer, you know, who's helping Mr. Kincaid

21   wash his eyes out, he can't even see.

22         I mean, I've really, really, really struggled with

23   this.  And the answer is -- and it's the truth and the Court

24   can find this credible or not but I think anything else

25   would be an untruth.  And that is that Mr. Kincaid was

1    curious.  He wanted to know what was going on.

2         And when he saw what was happening with the

3    rioters as the intensity picked up and started seeing

4    property damage and, you know, this wasn't discussed in the

5    government's memorandum.  You know, there was a lot of other

6    footage that does show Mr. Kincaid with his hands up.

7         There was one breach point that, you know -- even

8    what we did see, Your Honor, this isn't a violent.  This

9    doesn't look like a -- and outside of the Capitol door,

10   pardon me, the House Chamber door, which I will address.

11        But otherwise, his conduct was not violent.  He

12   was putting his hands up.  He was trying to have civil

13   conversation with law enforcement.  At that time, did he

14   think, Hey, I'm probably distracting them because I should

15   leave?  Probably not.  Not in that moment, and I think

16   that's a respectable point from the government, and I think

17   Mr. Kincaid respects that too as well.

18        But you see him, you know, throughout these couple

19   hours, being motivated or moving with the motivation to

20   actually try to make a difference.  And I've talked to him

21   about this at length, and I refer to it sort of like the

22   "Knight-in-shining-armor defense."

23        That's not a legal defense.  He truly thought that

24   he could make a difference by talking to the law enforcement

25   or a staffer, have someone come out, whether with a

1    megaphone or otherwise, and try to calm the crowd down.  He

2    truly, truly believed that, Your Honor, whether you believe

3    it's credible or not.

4           And again, you're going to hear from Mr. Kincaid,

5    but he did tell people to stop knocking over stanchions.

6    You know, the fact that he was in the front talking to law

7    enforcement, does that automatically equate with him being

8    the leader of the mob?  I really struggle with that, and I

9    think Mr. Kincaid does too because he certainly didn't go

10   there with any intentions to lead anything, certainly not a

11   mob.

12          But, as the government has presented, how can you

13   assert that this was your intention and motivation and then

14   take a baton at one point to a House Chamber door?  It can't

15   be reconciled.

16          When he did that on January 6th, 2021 and took

17   that baton to the House Chamber door that approximate 10

18   seconds, Your Honor, he made the worst mistake of his life.

19   He knows this -- again, it's unexplainable.  His involvement

20   got completely out of control at that point.  And I've told

21   him, frankly, he could have been shot.  He could have been

22   shot.

23          He's expressed to me that that day, that day in

24   general and certainly those moments were the most

25   frightening moments that have ever happened to him in his

1    life.  It's devastated him.  It's devastated his family, and

2    it surprised them.  I think, like many people that do know

3    Mr. Kincaid, that conduct surprised him.

4         Mr. Kincaid -- and I hope the Court will see

5    this -- and he's the only one that can really speak to you

6    so you can make this evaluation, is incredibly remorseful

7    about what happened.  He's beyond sorry about his conduct.

8         And to be clear, he takes full responsibility for

9    all his conduct, not just what he pled guilty to which, by

10   the way, was subsection (a)(1), I believe, was the offense

11   of conviction.  It may have been misstated earlier.  But

12   absolutely his conduct -- not by you,

13   Your Honor -- certainly his conduct at the House door too as

14   well.

15        I'm not going to address being untruthful with the

16   FBI because, again, I feel like the Court's listened to the

17   audio.  We don't believe that that happened at any time.  In

18   fact, his conduct thereafter in cooperating and sending

19   clothes and staying in touch also negates that too as well.

20        But his entire life, he's been a peaceful man.

21   He's so far from being a violent person.  This man would not

22   hurt a fly.  He's a family man.  He's a person with a big

23   heart and a strong moral compass that, for his entire life,

24   has been guiding him to do the right things.

25        On January 6, like I said, he was curious.  He

1    went to listen to the speech.  Whether he found it boring or

2    the most entertaining thing ever really is besides the point

3    because he started walking towards the Capitol.  He had no

4    intentions to go to the Capitol to storm the Capitol.

5          He went by himself without a plan.  He wasn't

6    wearing tactical gear.  He didn't bring any flags or signs

7    or T-shirts.  He was wearing nothing from any sort of

8    political orientation.  He didn't come with any weapons.

9    You know, these are differences from many other defendants

10   that appear in this court and in other courts.

11         Certainly, again, was not the leader of the mob

12   and he did not assault any law enforcement.  And again, we

13   don't -- I don't think there's any suggestion at this point

14   that he did, but many other defendants that appeared in

15   front of you, Your Honor, have thrown things.  They've said,

16   Let's get Nancy Pelosi out here; let's hang her.  They've

17   shouted obscenities.  They've stolen riot shields.  They've

18   done the heave-hoe.

19         He didn't injure anyone.  He didn't threaten

20   anyone -- and I take that back.  I know that absolutely his

21   actions in that door could be considered threatening without

22   a doubt and I do -- but, outside of that 10 seconds, he

23   didn't threaten anyone.  There's no doubt his moral compass

24   I spoke about needed to be recalibrated after that day.

25   There is no question about it.

1        And so how does the Court fashion an appropriate

2   sentence here?

3        Probation says incarceration is not needed here.

4   Probation is an arm of your court, Your Honor.  You don't

5   have to do what Probation says, but they do a good job and I

6   know you're appreciative of the report.  They've looked into

7   the details about Mr. Kincaid, his life, his compliance on

8   pretrial services and things like recidivism, et cetera.

9        The government says two months.  So is one day

10  appropriate?  What about 10?  What about 14?  What about 20?

11  This is the job I do not envy of yours, Your Honor, because

12  I don't think there is any magic number.

13       The reality is, and I don't think anyone can

14  dispute this, Mr. Kincaid does not need any rehabilitation.

15  He doesn't need any correctional treatment.  He doesn't need

16  treatment of any kind.

17       By all accounts, I would argue genuinely he really

18  doesn't need supervision.  He's not a danger to the

19  community.  But we have this issue of deterrence and

20  punishment.  And I think ultimately this is where what's

21  going to be driving the Court's decision here.

22       Does Mr. Kincaid need to sit in a cage for two

23  months to think about what he did?  Does he need to sit in a

24  cage at all?  Again, Probation doesn't think so and neither

25  do we, Your Honor.

1          Respectfully, I struggle to find a genuine purpose

2   for incarceration in this case as it applies to Mr. Kincaid.

3   This is all the more true as the Court has mentioned when

4   Mr. Kincaid is 76 years old.  He saw a doctor again this

5   week.  He's going to have another knee surgery.  He's got a

6   wife with two bad hips, just had surgery.

7          They live up in a rural place in Pagosa Springs.

8   His son passed away earlier this year while this case was

9   pending.  He's had a heart attack while this case was

10  pending.  Time is everything for him right now.  And his

11  wife relies on him and he relies on his wife.

12         We ask the Court, Your Honor, to listen to

13  Mr. Kincaid here, as I know you will, and make a decision to

14  sentence him based on his entire 76 years, his entire life

15  of good versus his transgressions on January 6, 2021.

16         And what I would say, Your Honor, is I feel

17  comfortable saying, but for that 10 seconds at the House

18  Chamber door, this decision would be quite easy for you I

19  think.  I feel confident saying that with respect to

20  incarceration.  The question is, for those 10 seconds, does

21  he need to sit in a cage for two months or a month and what

22  is that magic number.

23         If the Court does feel it's appropriate for some

24  detention, the Court has the option for home detention.  I

25  know the Court has done that in prior cases too as well.  In

1      terms of making up for what Mr. Kincaid did, absolutely he's

2      agreeable to pay the $876 fine and the $500 restitution.

3                I think the guidelines that Probation recommended

4      a $2,000 fine, what we know is the government has an actual

5      finite number and we would ask the Court to go with that if

6      that's in fact what the damage to that door was.

7                And then, finally, what he can do?  And this kind

8      of goes to future transitions of power while he's on this

9      planet.  And I tell this even to my DUI clients.  Talk to

10     people about what happened on January 6.  Talk about your

11     regressions.  Tell them what your mistakes were and how

12     devastated you are about what happened.  Do everything you

13     can to spread the word and make sure nothing like this ever

14     happens again.

15               Your Honor, I'm going to turn Mr. Kincaid over to

16     you.  We would ask that, if there is a sentence to

17     incarceration, that Mr. Kincaid be allowed to return to the

18     District of Colorado, self-surrender to the U.S. Marshals.

19     If there is going to be a sentence of incarceration of any

20     kind, he's set to go back to Denver and back home I believe

21     tomorrow.  I know that would mean a lot, certainly to him,

22     also his wife to be closer to her, et cetera.

23               **THE COURT:**  I have pretty routinely permitted

24     self-surrender in the event of incarceration, including with

25     respect to defendants whose even government proposed

1    sentence was substantially longer than Mr. Kincaid's.  So I

2    doubt the government will oppose it and, in any event, I

3    would intend to do that if I impose incarceration.

4             **MR. BRUNGARD:**  Very good, Your Honor.

5             **THE COURT:**  Thank you.

6             **MR. BRUNGARD:**  I'll turn Mr. Kincaid over to you.

7             **THE COURT:**  Mr. Kincaid, come on up.

8             **THE DEFENDANT:**  Pardon me.  I got bad legs and I

9    also have very bad hearing.

10            First of all, I want to say to you, Your Honor, I

11   understand what a difficult position you are in in trying to

12   figure out who I am and what I did or didn't do.  I do want

13   to share with you my perspective of what really took place,

14   which I think is somehow not necessarily equal to what you

15   simply see in a video.

16            So I'm going to try my best.  Before I do those

17   things though, I want to just read this little statement I

18   made.

19            **THE COURT:**  Please.

20            **THE DEFENDANT:**  And then after that, perhaps, try

21   also to provide you more of an understanding of what I went

22   through.

23            My name is Clive Alvin Andre Kincaid.  I had four

24   people that wanted to name me when I was born.  If it

25   appears to you that I am nervous, you are correct, because I

1    know what happened all too well and what should never have

2    happened.

3           It's followed me for nearly four years now.  This

4    is something I know will never escape me.  My wife and I

5    have lived in Colorado in a remote mountain valley at

6    9,600-feet elevation.  Staring directly up in front of us is

7    the continental divide at 13,000 feet.

8           We have lived there now for the last 30 years.

9    But most horribly, without our only child of 31 years, who

10    passed away this January and who had to be exposed to my

11    involvement at January 6th, which I deeply regret.

12           My wife is currently in the midst of having two

13    hip replacements, and I am facing a very significant

14    incident with my legs.  I have already had four knee

15    replacements.  The one now is very, very bad.  I saw a

16    doctor in Denver a few days ago.  He said this has to be

17    done as quickly as possible.

18           He said he's facing having up to, I think he said,

19    two months of commitments to other individuals, but he also

20    said, if anybody drops out of those two months, he would

21    want to see me ASAP.

22           So I want to tell you some more about both myself

23    and what happened.  When I was a young man, my father was an

24    extreme Marxist and I mean extreme.  And he would injure me

25    in certain ways and he would often beat my mom.

1          Later on, he urged me to join the Army and head

2     out to Vietnam so that I could learn all the military

3     material and thus be primed to be able to take out the

4     Captains and the Lieutenants.  He wanted me to shoot my own

5     people.

6          I was utterly appalled by my father and it was

7     then that I decided to leave the country.  I wanted to find

8     a way to be different from him.  I actually did leave the

9     country.  I went first to Canada and from Canada I went to

10    Europe for two years.

11         As a consequence of growing up around such

12    volatile household, I needed to find myself.  In so doing, I

13    became what I believed in, which was to be a kind, loving,

14    gentle and helpful person rather than a violent one like my

15    father.

16         On January 6th of 2021, I made the worst and most

17    unforgivable mistake of my life.  I have known since that

18    moment for a long time now, that day my actions in

19    continuously moving through the Capitol and clearly in

20    restricted areas, even though I was honestly attempting to

21    diffuse an impossible situation.

22         No matter how hard I tried to do so, I was

23    overwhelmed by something that obviously only made things get

24    worse.  I had truly tried to keep the police inside the

25    Rotunda -- excuse me.  I had truly tried to help the police

1    inside the Rotunda and also an adjacent assistant staffer.

2              I asked them if there was any way to fend off the

3    angry crowds while hoping that they could bring up two or

4    more senators that might yet be able to come out and help

5    usher people from the building while simultaneously

6    reassuring them that the process was an ongoing one and that

7    would take a long time -- it would take a long while for

8    them, the people, before the Congress or whatever could

9    finalize their critical work.

10             Unfortunately, none of that was even feasible.

11   And it was entirely unbeknownst to me that the Congress was

12   in lockdown.  I did not know that.  As the crowd got louder

13   and more vicious, rather than accepting the inevitable, I

14   made the most foolish and ultimately dangerous decision in

15   my life.

16             Rather than leaving the police immediately as well

17   as increasingly dangerous situation, I went full bore

18   thinking that somehow, no matter how foolishly, that I might

19   yet -- that I myself might have been able yet to urge

20   members of the college to help mollify the crowds.

21             It was the dumbest, most ignorantly sensible thing

22   I could have done.  The regret is palpable and has never

23   left my side from that very day.  I am horrified constantly

24   that my actions could have resulted in the injury or death

25   of both myself or others.

It is a horrible thing that has been -- I have been carrying. Having said that, the fact that I used a baton to hit the House Chamber door is hard, if not impossible, for me to comprehend. At that very moment, when I saw the fellow there holding the pistol through the Chamber door, "Oh, God, can it come to this," I said to myself. "How did I get in the middle of this mess?"

I cannot explain what happened other than it was the most ignorant and dreadful thing that I have ever done in my entire 70-plus years and one that I find both abhorrent and frightening as to how it ever overcame me.

The dreadful truth is that it was I and only I who was correctly responsible and thus deserves whatever I might be sentenced to. I understand that perfectly.

To say that I am regretful for what I did is an understatement. After I left the Capitol, I vomited twice in the street on the way back to the hotel while simultaneously questioning what I had just done.

I have no words. I could have blamed my actions on others that evening, but the reality is that my idiocy falls squarely on my own shoulders and no one else's. January 6th, 2021 was the worst day of my life and it continues to haunt me.

To make things worse, I have greatly devastated my own family and shocked them, knowing that it was entirely so

unlike me to be involved in such a crazy and heinous thing.
That has now managed to also endanger my marriage of 52
years.  I have clearly made a multitude of mistakes.

I would like to respond to the government's
suggestion that I am not remorseful for my actions because
of statements that I made to a reporter who called me at
home.

What did I mean in the *Durango Herald* article when
I said, "I would do it again"?  This was entirely
misconstrued.  I meant very simply one thing, that had
one been able to do what I could not do, which was to
somehow be able to have helped the police and the staffer
overcome the crowd, circumstances might have possibly ended
up better.

But that ends in a falsehood that never would have
happened.  Again, I am beyond shamed for my actions and
totally devastated by the outcome.  It was not a hard
decision for me to accept responsibility for what I did.

I want to be clear about another misunderstanding.
This one is really important that, while the FBI did ask me
endlessly in the airport questions during an interview after
January 6th and discussed more than an hour with me of
questions that they put before me, they also simultaneously
reassured me that there were three known incidents that
occurred that day that they had actual evidence of and that

1    I had been honest with them.

2              First, when I had been lucky that an actual police

3    commander saved my life for not letting me fall backwards

4    onto the stone steps.  The reason is here and you saw a

5    video just moments ago, was something that probably none of

6    you really saw well and understood.  I walked up to the

7    northeast corner of the Capitol -- by the way, I had

8    testified in Congress before.

9              **THE COURT:**  Yes, I recall.

10             **THE DEFENDANT:**  I had come up there in a somewhat

11   jolly way, if you will -- by the way, I never voted for

12   Trump just to let that --

13             **MR. BRUNGARD:**  Speed it up.

14             **THE DEFENDANT:**  Well, I've got some more to say.

15   But now I've lost -- just a minute here, I have to regain my

16   poise.

17             What you saw there was I ran into five kids who

18   were standing on a wall.  They were between the ages of 18

19   and 22, one girl and four boys.  And they said -- I said to

20   them.  I said, What are you doing up there on this wall?

21   And they said, Well, here, come on up, we'll give you a

22   hand.  Just kids.  We were sitting there laughing and

23   talking.

24             I said, you know, why are you here?  And they

25   said, Oh, well, we didn't want to -- we don't -- we want to

1     get around to the other side of the Capitol.  I said, Well,

2     why don't you walk around?  They said, well, this is a

3     shortcut.  We just want to take a shortcut.

4             And that's when somebody came out of nowhere and

5     started shooting.  I hadn't heard of this before.  I didn't

6     know anything about it, and I suddenly took six bullets,

7     including one that hit this eye right here on this bone.

8             That was a reaction.  I said, Oh my God.  How does

9     this happen?  Somebody just shot me.  And I dove into the

10    stairway under the -- what do you call it -- the

11    scaffolding.  And I called up to the commander who was

12    standing some 20 feet in front of me but at the top.

13            And I said, Sir, sir, I want to walk up here and I

14    need to talk to you.  I need to talk to you because

15    something just dreadful happened.  I was referring to my

16    being shot.

17            And as I walked up, I didn't realize that so many

18    people were starting to gather around behind me.  You see

19    that in the movie, but what you didn't see is that I went up

20    first and then people started to all do the same thing.  I

21    got up to the top.

22            By the way, the metal whatever it was, I only held

23    onto that because I was afraid of falling.  I have very bad

24    legs.  And I got up to the top, and I was talking to the

25    commander.  I was standing two steps below him saying, you

1    know, this is a terrible situation here.  And I turned

2    around and shouted at people, Stop.  Stop.  You know?

3              And then I returned to him again.  And then,

4    behind the commander I got sprayed into my face from

5    somebody.  I went ballistic screaming because I was blind.

6    I was utterly blind.

7              Now, what did the commander do?  My God, he saved

8    my life.  He picked me up to his chest and he passed me to a

9    young man named Jimmy who was a policeman who had only been

10   there for a few months.  And he said, take this gentleman,

11   Jimmy, and take care of him.  Wash his face.

12             For 30 minutes this young man slowly walked me

13   around the Capitol to the front to the northeast corner as I

14   cried and cried and tripped, and I was terrified that I'd

15   never be able to see again.

16             So what happened?  I mean, I ran into a situation

17   that I had never, ever witnessed in my life before.  As a

18   consequence, I was moved by what had happened, what was

19   happening, what was happening in the entire environment

20   around the Capitol.

21             And I went, yes, I went and walked -- when I could

22   finally see again, I went and walked to the steps and

23   climbed up the steps, made my way as closely as I could to

24   the door because I wanted to know what the heck was going

25   on.

1    The vast majority of the people that were up there

2  were laughing and raising or throwing flag -- waving flags

3  but there were bad people too.  There were bad people that

4  were right in the door, banging on it with sticks and stuff

5  like that.  And I was standing back about 30 feet watching

6  what the heck was going on when all of a sudden, as my

7  attorney here said, the door opened.

8    I did walk directly in.  I had been in the Capitol

9  before.  I chased down a young man who was trying to knock

10  over things.  To me, the Rotunda was holy.  I have the

11  greatest respect for the building itself and for what this

12  meant to our country.  It was the center of our nation.  I

13  stopped him and I admonished him and said, Don't ever do

14  this again.

15    And yes, after that, I walked another 40 feet, or

16  ran rather, to another group of policemen who were having

17  trouble.  And I immediately got to them and I turned around

18  and I talked -- the 10 people or so that were there, I said,

19  Stop, everybody.  Just stop.  Let me talk to this gentleman,

20  the commander.

21    We talked briefly and then he said, go talk to

22  these other -- there were five or six police.  I stayed with

23  them for seven minutes helping them try to fend off the

24  people who were doing terrible things, screaming.

25  Eventually it turned into, as they call it, a mob.

1          What happened after that is hard to even

2   contemplate.  And you won't believe this, I know.  It's

3   something that is not likely to be believable, but I

4   thought, I thought that the -- what it's called -- what's it

5   called where they are all -- they were down there in a

6   college -- you know, talking about the -- help me here.  The

7   review with --

8          **THE COURT:**  The certification?

9          **THE DEFENDANT:**  Huh?

10          **THE COURT:**  The certification?

11          **THE DEFENDANT:**  Yeah, right.

12          And I said to myself, Maybe, maybe, maybe I could

13   actually get ahold of somebody inside that building that

14   would be able to understand what I was trying to do which is

15   to come out of the building and help the police.

16          It sounds idiotic, but that is actually what I was

17   trying to do until I saw what happened.  And the fellow was

18   there opposite me with a pistol.  And I said, Oh my God.

19   How did this happen?  How did this end?  How does it end?

20   And I was mortified, absolutely mortified, as I am to this

21   very day.

22          As far as that goes, all I can say is I know you

23   must do what you must do.  I am more than willing to accept

24   whatever I am given.  But I do want you to understand that I

25   was not being a bad person.

1          I was trying my damnedest to help turn everything

2   around.  And I don't know if there is anything else you want

3   to ask me or not but I'm -- okay.  Sorry.

4          **MR. BRUNGARD:**  Any questions, Your Honor?

5          **THE COURT:**  No, I appreciate your statement.

6          **MR. BRUNGARD:**  That's all I have, Your Honor.

7          **THE COURT:**  Thank you.

8          Before I pronounce the sentence and, in

9   particular, walk through the 3553(a) factors, I'm just going

10  to summarize the positions of the parties for the record.

11  Everyone knows them but I think it's sometimes helpful

12  because it frames things to some extent.

13         The government has proposed a sentence of

14  two months of incarceration, a year of supervised release, a

15  fine of $876 and $500 in restitution.

16         Mr. Kincaid proposes a probationary sentence

17  together with a fine and restitution or at least doesn't

18  have a problem with those.

19         Probation recommends against incarceration and

20  instead recommends a sentence of 36 months probation, a more

21  substantial fine to some extent of $2,000, $500 restitution.

22         In imposing a sentence, as everyone knows, I have

23  to consider a series of statutory factors, the first of

24  which is the nature and seriousness of the offense.  As I've

25  said, many, many, many times now, the events of January 6th

1    were unquestionably serious.

2            Mr. Kincaid and others entered the Capitol and its

3    grounds while a joint session of Congress was meeting to

4    certify the results of the election.

5            Some planned to come to the Capitol for the

6    express purpose of interrupting those proceedings.  Some

7    used violence against law enforcement officers or engaged in

8    vandalism.  Some engaged in planning efforts before

9    January 6th suggesting that they intended to engage in

10    violence.

11            Every participant that day made an impact, as

12    one of the primary strengths of the crowd and the rioters

13    was their number, overwhelming law enforcement several

14    times.  That's not to say that Mr. Kincaid engaged in the

15    most problematic conduct of the kind I just summarized at

16    all.

17            But his personal conduct on January 6th was

18    serious.  He traveled down from Pittsburgh to attend the

19    Stop the Steal Rally.  He walked to the Capitol where he was

20    ultimately shot with six rubber bullets.  One would think,

21    at that point, he would turn around and leave.

22            But despite getting hit with six rubber bullets,

23    including one in the face, he pressed on, yelled at officers

24    and, as we discussed as well today, he was pepper sprayed

25    and had to recover from that in the event that Mr. Kincaid

1    just described.

2            One would think that, having been shot with six

3    rubber bullets and pepper sprayed, that Mr. Kincaid would

4    leave but he did not.  Instead, he ultimately entered the

5    building and, as we saw earlier today, took a baton and

6    struck the House Chamber door probably about 11 times and

7    the glass on that door was ultimately broken.

8            He did remain inside the Capitol for a

9    considerable period of time.  And as the video reflects

10    earlier -- well, he certainly didn't engage in violence

11    toward persons and I'm not suggesting he did.

12            One of the videos shows that he was in a crowd

13    when an officer was pulled into that crowd.  And the

14    distress and fear on that officer's face is remarkably

15    palpable and actually quite sad and scary.

16            But again, as I said, while Mr. Kincaid's conduct

17    that day was serious, it was certainly much less serious

18    than many.  There's no evidence to suggest he planned to

19    even try to enter the Capitol let alone engage with law

20    enforcement.  He did not in fact engage with law enforcement

21    in the physical sense.

22            So his conduct is, while serious, is much less

23    serious than many people I've had to sentence.  There is no

24    evidence that he wore any sort of special gear or anything

25    like that.  So his conduct was serious but certainly not as

1    serious as some others.

2    As to the history and characteristics prong,

3    he's -- as we talked about before, he's 76 years old.  He

4    resides in rural Colorado.  He graduated magna cum laude in

5    the '70s from UCLA.

6    I think it's fair to say his two-parent household

7    he grew up in was tumultuous, even worse than that really.

8    He reported to Probation that he was the victim of abuse at

9    times from his father.  He has zero criminal history.

10    He has a supportive family and, in my view, his

11    remorse today in his papers, his willingness to speak to the

12    government in the past, his resolution of this case and what

13    he said today, his remorse, in my view, is quite genuine.

14    In my view, his history and characteristics weigh

15    significantly in his favor.

16    The next prong I have to consider is the need to

17    ensure that the sentence I impose promotes respect for the

18    law.  I have to ensure that the sentence I impose is

19    properly calibrated to deter both Mr. Kincaid and others

20    from engaging in similar conduct or criminal conduct in the

21    future.

22    In my view -- I don't think the government or

23    Probation or anyone really disagrees with this.  I'm not

24    suggesting that there is any question here, but Mr. Kincaid

25    sure seems to pose a very low risk of recidivism.  He has no

1    previous convictions.

2            It's unlikely that anything like the precise

3    circumstances that led to January 6 will recur.  Even if

4    they do, everything I've seen today suggests that

5    Mr. Kincaid deeply regrets his having been here that day.

6    And I do not see a world in which he does anything like what

7    happened on January 6th let alone any other criminal conduct

8    for the rest of his life.

9            It remains, as we discussed a little bit before,

10   head-scratching to me that someone who got shot with six

11   rubber bullets and then later pepper sprayed didn't have the

12   good sense to leave.  And he didn't.

13           I don't think that makes him a likely recidivist.

14   It's a head-scratcher.  And I realize that the story is

15   perhaps that Mr. Kincaid could have done something to

16   prevent the violence by getting a member of Congress to come

17   out and speak.  That's pretty far-fetched and fanciful idea.

18           And clearly the reasonable course for anyone at

19   January 6th would have been to turn around and walk away but

20   certainly when somebody who was shot with rubber bullets

21   including in the face and pepper sprayed.

22           But as Mr. Beach rightly points out, deterrence

23   isn't just to the individual.  It's -- I have to consider

24   the need to ensure that the sentence I impose here serves as

25   a general deterrent.  And as I said, it can't, it won't be,

1    it shouldn't be acceptable if, in a year or in five years,

2    some other perhaps well-meaning relatively elderly person

3    engages in the same kind of conduct that Mr. Kincaid engaged

4    in.

5         So I have to be considering general deterrence

6    and, of course, not just to people who are very similar to

7    Mr. Kincaid but anyone who thinks it's appropriate to engage

8    in the kind of highly inappropriate and illegal conduct as

9    occurred on January 6th.

10        And an exceedingly light sentence here may not

11   sufficiently deter other would-be rioters.  So the need for

12   general deterrence surely weighs in favor of a period of

13   incarceration.

14        The other thing I have to consider is the need to

15   avoid unwarranted sentence disparities.  As people who have

16   sat in this courtroom know, I care a lot about this because

17   I've now sentenced more than 50 people with respect to their

18   conduct on January 6th.  So it's a set of sentences that

19   allow me or, in my view, require me really to ensure that

20   I'm being just and principled and fair in how I think about

21   sentences.

22        The parties have provided me with comparator

23   cases.  I think the following general thoughts are true.

24   Each case is different and this is one of them.  I said it

25   before in my questioning of the government and I believe

1    it's true here.

2            Mr. Kincaid's conduct on January 6th was

3    substantially worse than others as to whom I've given only

4    sentences of probation and that is a very important part of

5    the sentencing consideration here.

6            In fact, his conduct that day is arguably worse

7    than Kurt Peterson's and -- I don't know -- not that similar

8    from Derek Nelson's, although Mr. Nelson clearly planned

9    more of the events than Mr. Kincaid.

10           But the events that day are not the only thing I

11   must consider.  I have to consider the person, the specific

12   recidivism, specific deterrence, the nature and

13   characteristics of the defendant.

14           And so that really leaves me where I was an hour

15   ago in my questions to the government, which is to say, I

16   have presented before me someone whose conduct, if he were

17   less remorseful, younger and more of a risk of recidivism,

18   would lead me to a period of incarceration that would

19   probably be higher than what the government is proposing.

20           I realize the government is proposing it in this

21   context.  I'm not suggesting the government's proposal here

22   is too low or anything like that.  I'm just saying, if we

23   had a different person in front of us, I would be

24   considering a more substantial period of incarceration than

25   even the government proposed.

1          But on the other hand, given Mr. Kincaid's obvious

2     remorse, given what he said about the events of that day,

3     given his age, given his health, is it even warranted to put

4     him in jail?

5          Let me just be very clear, but for those personal

6     characteristics, I think I would very likely be sentencing

7     Mr. Kincaid to 90 days if not more of jail.  I'm just not

8     sure that incarceration is warranted here.

9          And so this is a rare case in which I have

10     concluded that the unique personal characteristics of the

11     defendant, in particular his health, his age, his remorse,

12     result in a non-custodial sentence.  But mere probation to

13     me isn't quite right either.

14          It seems to me there has to be some more teeth to

15     it.  And I think I have the authority to impose as a

16     condition of probation a period of home incarceration.

17     Probation agrees with that, yes?

18          **PROBATION:**  Yes, Your Honor.

19          **THE COURT:**  So I am going to impose a period of

20     12 months of probation, not the 36 months proposed by

21     Probation, 12 months of probation, 3 months of which must be

22     satisfied through what I'll call home incarceration, but is

23     sort of the strictest version of must-stay-at-home.

24          There's a theory behind this, which people may not

25     care that much about.  But the idea in my head at least is,

1    if it weren't for Mr. Kincaid's personal characteristics, he

2    would be getting 90 days of incarceration.

3         Because of his personal characteristics, all of

4    the things I've talked about before, he is not getting

5    incarceration.  But the 90 days of home incarceration are

6    designed to parallel what I would be giving him but for

7    those personal characteristics.  I'm also going to order the

8    special assessment of $25, the fine of $876 and the $500 in

9    restitution.

10        I just need to paper the record, so to speak, with

11   a few other things.  You have some limited appeal rights,

12   Mr. Kincaid.  Pursuant to the Plea Agreement, if you were to

13   choose to appeal, you must do so within 14 days after the

14   entry of judgment.

15        You also have some limited rights to pursue a

16   28 U.S. Code 2255 habeas petition.  And again, that's

17   consistent with the Plea Agreement and the discussion we had

18   at the time of the plea.

19        As it relates to your period of probation, so now

20   I'm talking about the 12 months, for the full 12 months, you

21   must not commit another federal, state or local crime.  You

22   must not unlawfully possess a controlled substance.  You

23   must refrain from any unlawful use of a controlled

24   substance.  I'm not going to require any drug testing,

25   because I don't think there is a significant risk that you

1    will violate those conditions.

2            You must make your restitution, fine and $25

3    assessment.  The restitution payment has to go to the

4    Architect of the Capitol, and the other payments must be

5    made to the Clerk of Court at 333 Constitution Avenue,

6    Washington, D.C. 20001.  So those are the general

7    requirements for the period of probation.

8            Can we talk a little bit about what I need to say

9    more with respect to what I'm calling home incarceration?  I

10   may not need to say anything more, but why don't you come up

11   to the podium and talk about either the language or what I

12   have in mind.

13           **PROBATION:**  Good afternoon, Your Honor.

14           So for home incarceration, that is the strictest.

15   There is also home confinement which allows for medical,

16   work, school, other reasons to leave the house.

17           Does Your Honor want the condition language?  Is

18   that what you're asking for?

19           **THE COURT:**  Well, I guess what I would say is, I

20   think, in light of the fact that this is really an

21   alternative, in a sense, to incarceration I want, it seems

22   to me it should be the most restrictive of the versions of

23   this.  And so I am imposing home incarceration.  I think

24   that satisfies that.

25           **PROBATION:**  Uh-huh.

1      **THE COURT:**  It does seem to me that we know

2  Mr. Kincaid has a surgery coming up, and I would like to

3  ensure that whenever that happens that he can do so

4  consistent with my order of home incarceration.

5      And so I don't know whether you think I should

6  just allow medical visits as an exception to home

7  incarceration or something like that, but I do want to

8  ensure that he can do that.

9      **MR. BRUNGARD:**  Yes, Your Honor.  You can fashion

10  the language to how you would like it.  So if you wanted to

11  include medical visits, surgery, operations like that in the

12  language, that is something you can do.

13      **THE COURT:**  So do you think I should just

14  say -- and forgive me, I might as well just make sure we get

15  it right -- 12 months of probation, 3 months of which to be

16  served through home incarceration with medical visits and

17  surgeries permitted.  Something like that?

18      **PROBATION:**  Yes, Your Honor.

19      **THE COURT:**  Okay.  Thank you.

20      Any objection the government would like to

21  preserve or raise with my sentence?

22      **MR. BEACH:**  No, Your Honor, not beyond our own

23  recommendation.

24      **THE COURT:**  Thank you.

25      Counsel?

1          **MR. BRUNGARD:**  No objections, Your Honor.  I

2      appreciate the Court's analysis.

3          I want to at least say one thing just to make sure

4      this is on the record.  Because of the nature of his home

5      being at 9600 feet, Pagosa Springs, they get some of the

6      most snow in Colorado.  It's been --

7          **THE COURT:**  The home of Wolf Creek ski area.

8          **MR. BRUNGARD:**  That's correct, Your Honor.

9          It really is some of the most snow in Colorado and

10      so they're up there.  They literally can't leave in certain

11      winter months.

12          So I think -- I'm assuming -- I don't know if

13      there's going to be a time within which he must do this by

14      or within which he must start, but it could be that there is

15      a change of address during that service.

16          **THE COURT:**  That is fine.

17          **MR. BRUNGARD:**  He would have to work it out with

18      pretrial services --

19          **THE COURT:**  I understand, and I think that will

20      get worked out.  And I remember that from the brief.

21          **MR. BRUNGARD:**  Okay.

22          **THE COURT:**  It seems to me that if we're starting

23      today, tomorrow, that gets you to mid-November.  And I don't

24      know if it starts snowing that early in the year, but we can

25      work it out.  And if anyone needs to come back to me and

1    say, Hey, we were living in Pagosa Springs and I was in home

2    incarceration there but we're going to move in two weeks,

3    we'll work that out.

4             MR. BRUNGARD:  Essentially, what I'm going to have

5    him do, Your Honor, if this makes sense, is report to

6    Probation immediately, probably -- like, I don't know if

7    that can happen by tomorrow, but at the latest Monday

8    morning if that's okay.

9             THE COURT:  Perfect.

10            MR. BRUNGARD:  Okay.

11            THE COURT:  Great.  Anything else?

12            MR. BRUNGARD:  No, Your Honor.  Thank you.

13            THE COURT:  The government probably needs to

14    dismiss the remaining counts in the charging document.

15            MR. BEACH:  Yes, Your Honor.  I move to dismiss

16    Counts 2 through 4.

17            THE COURT:  That motion, I assume, is unopposed.

18            MR. BRUNGARD:  That's correct, Your Honor.

19            THE COURT:  And is granted.

20            Okay.  Thank you, all.

21        (Proceeding concluded at 2:08 p.m.)

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9

10    September 20, 2024          /s/ Lorraine T. Herman
              **DATE**                    **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25